547 A.2d 372

**Andrew J. KUCHAK, Administrator of the Estate of Susanne A. Kuchak, Deceased**

**v.**

**LANCASTER GENERAL HOSPITAL, John H. Shertzer, M.D., David P. Hughes, M.D., and David L. Newcomer, M.D.**

**Appeal of LANCASTER GENERAL HOSPITAL.**

Superior Court of Pennsylvania.

Argued Feb. 11, 1988.

Filed Aug. 30, 1988.

Wiley P. Parker, Lebanon, for appellant.

William A. Atlee, Jr., Lancaster, for Kuchak, appellee.

Before TAMILIA, HOFFMAN and HESTER, JJ.

HESTER, Judge:

This is an appeal from an August 7, 1987 order wherein delay damages were awarded to appellee, administrator of the estate of Susanne A. Kuchak, deceased. Pursuant to the reasoning in *Craig v. Magee Memorial Rehabilitation Center*, 512 Pa. 60, 515 A.2d 1350 (1986), the trial court determined that appellee was responsible for eight of the forty-eight month delay between the filing of the complaint and the verdict in favor of appellee. It awarded delay damages accordingly. We affirm the imposition of delay damages as set forth in the order.

Appellee instituted this medical malpractice action against Lancaster General Hospital, appellant, and three physicians for allegedly negligently causing the death of fifteen-year-old Susanne Kuchak. Susanne sustained leg fractures in a motor-vehicle-bicycle accident on October 12, 1978, and died a week later in Lancaster General Hospital, where she was being treated. She died as a result of fat emboli syndrome wherein fat emboli entered her lungs, heart and brain. The

fat emboli entered the vital organs from bone marrow exposed as a result of the fractures.

The action was instituted on October 10, 1980, by writ of summons, with the complaint being filed one and one-half months later, on December 2, 1980. The parties conducted discovery over a three and one-half year period. Appellee took twenty-two depositions and filed numerous interrogatories and requests for production of documents. Appellant made no settlement offer prior to trial; appellee made a settlement demand of $300,000, which was the exact amount the jury awarded December 12, 1984.

The trial court awarded delay damages in the amount of $120,821.91 on February 4, 1985. An appeal followed the January 16, 1986 denial of appellant's post-trial motions. The issue was whether delay damages had been properly awarded, and we remanded for proceedings consistent with the recent decision in *Craig v. Magee Memorial Rehabilitation Center, supra.*

On August 7, 1987, the trial court entered an order wherein it attributed eight months of the delay to appellee [1] and awarded delay damages accordingly. It stated:

It is the considered opinion of this Court that Plaintiff proceeded expeditiously in preparing a very complex medical malpractice action for trial but that not providing the initial expert medical report diminished the possibility of an offer of settlement. Therefore, the Court ascribes the period between the dates of both parties' initial expert medical reports to a time span for which Plaintiff should not benefit and Defendant Hospital should not be penalized. This result is not only fair and reasonable but also equitable.

This case involved complicated medical evidence in explanation of an untoward result to a simple occurrence: death caused by fat embolism syndrome following a long bone fracture of the leg as a result of an automobile striking Plaintiff's decedent while on her bicycle. All of the Defendants originally sued were health care provid-

---

**1.** Appellee did not appeal from that portion of the order.

ers, necessitating expert as well as factual discovery. Concomitant with such extensive discovery were many delays in scheduling.

Trial court order, 8/7/87, at 1–2. This appeal followed.

Initially, we discuss the *Craig* opinion, where the supreme court reconsidered its opinion in *Laudenberger v. Port Authority of Allegheny County*, 496 Pa. 52, 436 A.2d 147 (1981). *Laudenberger* had upheld the constitutionality of Pa.R.C.P. 238, which called for the automatic imposition of delay damages if the jury verdict was 125 percent more than the defendant's settlement offer. The court noted that this experimental and automatic rule was both reasonable, as it had been adopted to clear dockets overcrowded by unreasonable refusals to offer what was due, and salutary, in that it provided a penalty for profiting from denials of money due. The *Craig* court noted the rationale for the rule: there was deliberate and profitable delay by tortfeasors in failing to settle cases since they retained the use of the money during delay caused by overcrowded dockets.

The *Craig* court rejected the *Laudenberger* court's reasoning that a refusal to settle is always prompted by these motives. It suspended Rule 238's incontestable presumption that all fault for delay is attributable to the defendant, and announced the following rule:

> In making a decision on a plaintiff's entitlement to delay damages the mere length of time between the starting date and the verdict is not to be the sole criterion. The fact finder shall consider: the parties' respective responsibilities in requesting continuances, the parties' compliance with rules of discovery; the respective responsibilities for delay necessitated by the joinder of additional parties; and *other pertinent factors*.

*Craig v. Magee Memorial Rehabilitation Center, supra,* 512 Pa. at 66, 515 A.2d at 1353 (emphasis added) (footnote omitted).

In this case, the trial court determined that the delay was not the fault of appellee, who had proceeded expeditiously in preparing a complex medical malpractice action. Appel-

lant argues that the trial court was incorrect in three respects.

First, appellant argues that all delays must be attributed to appellee since all requests for continuances were made by him. This allegation states the obvious and misses the point. As appellant aptly notes in his brief, in a medical malpractice action, it is a plaintiff's burden to present expert medical testimony to establish the standard of care to be applied and to demonstrate that the standard has not been achieved. *Brannan v. Lankenau Hospital*, 490 Pa. 588, 417 A.2d 196 (1980).

Accordingly, appellee had to depose each medical provider who participated in the care of the decedent. He took twenty-two depositions. He then had to have the care providers' actions analyzed and compared to standard medical procedure. There were three physicians involved. Many of the delays in discovery resulted from their unavailability or from their scheduling conflicts with the attorneys. These normal delays are always present and naturally affect the length of discovery. We refuse to categorically impute natural delays in discovery to plaintiffs unless it is demonstrated that the plaintiff failed to take reasonable and normal steps to prepare his case and proceed to trial. The trial court in this case specifically found that appellee had expeditiously prepared his case. The continuances were necessary as discovery was incomplete, and the trial court determined that the state of discovery did not result from appellee's failure to proceed diligently. Accordingly, appellee is not responsible for the continuances as the *Craig* court intended responsibility to be placed.

Next, appellant argues that appellee failed to comply with the rules of discovery by failing to identify his expert and his expert's testimony as requested in its interrogatories filed on December 10, 1980. We disagree. Initially, appellee could not know of the substance of his expert's trial testimony until he had completed his depositions of the health care providers and knew what actions they had taken. He provided the initial report, but his expert's trial

testimony would be wholly dependent on a full knowledge of all the defendants' actions with respect to Susanne's care. Furthermore, the trial court specifically ruled that appellee could provide his experts' opinions at anytime prior to the first pretrial conference. Reproduced Record at 61a. Appellee complied with this order, which was entered because one of the defendants had tried to compel appellee to reveal the substance of his expert's testimony in January, 1983. The trial court reasonably ruled then that appellee had until the conclusion of his discovery to comply with this request. Thus, appellee did not violate the rules of discovery.

Finally, appellant argues that the purpose of Rule 238 is not being served with the imposition of delay damages since appellee withheld the expert report until trial. Appellant argues that this was material it needed to engage in meaningful negotiations. Appellant at no time submitted an offer, even after it received the report of appellee's expert. Meanwhile, it had the initial report. Again, we must repeat that this trial report could not have been prepared until completion of discovery. Also significant is that appellant, as defendant, already had knowledge of its actions and did not require the benefit of discovery to analyze its culpability in Susanne's death. Thus, it always had the information it characterizes as so meaningful to settlement negotiations. It refused to negotiate and now attempts to shift the responsibility to appellee's failure to provide a report appellee could not have and was not required to provide until the pretrial conference.

Since neither party is responsible for the continuances and both parties complied with the rules of discovery, we must look to other "pertinent factors" in deciding whether to uphold the imposition of delay damages in this case. In so doing, we apply the rationale for the rule, and look to whether appellant was unreasonable in failing to settle. If so, it is more appropriate to require appellant to pay to appellee the interest that it has earned from the $300,000

that it thus would have owed to appellee since October 19, 1978, when Susanne died.

In determining whether a party's decision regarding settlement of a case is unreasonable or in bad faith, we turn to *Shearer v. Reed*, 286 Pa.Super. 188, 428 A.2d 635 (1981). In *Shearer*, we adopted certain factors to be used in analyzing whether an insurer's failure to settle within its policy limits was a good faith decision. These factors, which focus on the strengths and weaknesses of the parties' positions, are appropriate to apply here in that they enable us to determine if the defendant was reasonable in refusing to offer an amount that the evidence establishes was, in fact, due. If the refusal was not reasonable, it will be appropriate to penalize the defendant from profiting from the denial of money. The factors, adopted for our circumstances, are: 1) the strengths and weaknesses of all the evidence, including evidence of liability, to be presented on both sides; 2) the anticipated range of the verdict; 3) the relative appearance, persuasiveness and appeal of the plaintiff, defendant and various witnesses; 4) whether the plaintiff has engaged in reasonable negotiations and 5) the amount of any offers compared to the jury award.

Our review of the evidence reveals the following. Susanne was admitted to the hospital at 9:05 p.m. on October 12, 1978, with three bone fractures. She was at high risk to develop fat emboli syndrome ("f.e.s.") due to both her age (the disease strikes younger people more frequently), and the nature of her trauma, bone fracture. F.e.s. results from bone marrow throwing out fat emboli into the bloodstream. Initially, there are three symptoms which result from the emboli invading the heart, lung and brain: increased pulse, increased breathing rate, and confusion or sleepiness. Later, the patient will develop splotches or a rash. Elevated temperature may also accompany f.e.s.

When admitted to the hospital, Susanne was alert, conversant and her pulse was normal, 60, for a fifteen-year-old

girl. Normal range for her age and sex is 55–80. During October 12 and 13, 1978, Susanne's pulse rate and treatment was as follows:

| October 12, 1978 | Pulse Rate |
|---|---|
| 9:05 p.m. | 60 |
| 9:15 p.m. | 58 |
| 9:45 p.m. | 60 |
| 10:00 p.m. | 80 |
| 10:15 p.m. | 84 |
| 10:30 p.m. | 88 |
| 10:45 p.m. | 84 |
| 11:00 p.m. | 84 |
| 11:15 p.m. | 116 |
| 11:30 p.m. | 100 |
| 12:10 p.m. — 1:15 a.m. | Operation on fractures |

| October 13, 1978 | |
|---|---|
| 1:20–2:00 a.m. | Pulse taken four times, all 120 |
| 2:15 a.m. | 120 |
| 2:30 a.m. | 120 |
| 2:45 a.m. | 128 |
| 3:00 a.m. | 120 |
| 3:15 a.m. | 120 |
| 3:45 a.m. | 124 |
| 4:15 a.m. | 128 |
| 4:45 a.m. | 112 |
| 5:15 a.m. | 120 |
| 6:15 a.m. | 120 |
| 8:00 a.m. | 104 |
| 12:00 p.m. | 128 |
| 4:00 p.m. | 132 |
| 4:30 p.m. | Patient examined by Dr. David P. Hughes, who eliminated f.e.s. by clinical observation of patient |
| 5:50 p.m. | Patient examined by Dr. David R. Newcomer, who eliminated f.e.s. by clinical observation |
| 8:00 p.m. | 150 |
| 8:30 p.m. | 150 |
| 9:00 p.m. | Susanne found unconscious, Dr. Cooke called. He ordered the standard blood gas test that is used to determine the existence of f.e.s. |

At 9:00 p.m. Susanne was administered steroids and placed on a ventilator, the standard treatment for f.e.s. She was restless in the morning of October 14, 1978, and to prevent the ventilator from being dislodged, valium was prescribed. The valium was not administered, and Susanne subsequently dislodged the ventilator, resulting in decreased heart rate and absence of oxygen for sixty seconds.

Susanne never recovered consciousness and died on October 19, 1978.

Susanne's mother testified that Susanne was alert and able to converse in the emergency room and following her operation at 8:30 a.m. on October 13, 1978. She noticed that Susanne was losing alertness throughout the day, but was told by nursing staff this was normal post-operative behavior.

Dr. Michael P. Casey testified for the plaintiff as an expert regarding the existence of malpractice in Susanne's case. He attended Fordham University and University of New York Medical School, and performed three years of internal medicine at the latter. He also performed a two-year pulmonary fellowship at the University of Pennsylvania. Subsequently, he became director of the respiratory intensive care unit at Thomas Jefferson Hospital for one year and was then appointed head of pulmonary medicine at Pennsylvania Hospital in Philadelphia.

He testified that appellee's treatment of Susanne deviated from accepted medical practice in several respects. First, the patient's abnormally high pulse rate indicated that there was a complication and tests should have been performed to determine the reason for the elevated pulse. A standard arterial blood gas test reveals f.e.s. Also, the vital signs were not monitored in accordance with established medical procedure. Notable are the four hour gaps in pulse monitoring, even though Susanne's pulse was elevated following surgery. Third, the nursing staff improperly failed to inform physicians regarding the elevated pulse. Particularly relevant is the failure to inform them of the 150 pulse rate, which is a "significant" deviation from normal. N.T. 12/3–12/84, vol. 1, at 219. Finally, when Susanne went on a ventilator, steps should have been taken to ensure that she did not extricate it. Appellant's employees failed to perform any of the four standard methods of securing the ventilator tube to Susanne, resulting in extrication of the ventilator, depression of vital signs and increased risk of death.

The doctor's testimony was very convincing regarding appellant's failure to investigate the elevated pulse, since vital signs are monitored in order that they can be investigated if abnormal. He stated that from 1:30 a.m., on October 13, 1978, when surgery was complete, to 9:00 p.m. that evening, when Susanne became stuporous or comatose, her pulse rate was abnormal, it continued to increase and that "nothing" was done to explain the phenomenon. *Id.* at 221–22. His testimony on appellee's malpractice was unequivocal:

[Q.] Doctor, assuming all of those facts which I have just given to you to be reasonably true and accurate, do you have an opinion which you can state to a reasonable degree of medical certainty as to whether the conduct of Dr. Hughes in failing to order an arterial blood gas for Susanne Kuchak at or about the time of his examination of her on October 13, 1978 was in accordance with accepted standards of medical practice in effect in 1978?

A. Yes, I do.

Q. What is your opinion, Doctor?

A. I do not think that was in accord with accepted medical practice.

Q. Would you explain your answer, please.

A. The patient had an abnormally high pulse rate. Something was wrong with the patient, and I think steps should have been taken to investigate why the pulse rate was abnormal.

Those steps were not instituted and, therefore, I think it was wrong.

Q. Doctor, are you telling us today that Dr. Hughes did not act in accordance with accepted standards of medical practice because he didn't diagnose fat embolism at 4:30 on the afternoon of the 13th of October, 1987?

A. No. I'm not saying that.

Q. Okay, what you are saying is that he did not undertake to do anything confronted with the signs and symptoms? Is that my understanding?

A. That is correct.

Q. And what of those signs and symptoms that I outlined to you and those facts, is the one that stands out as the most important?

A. The high pulse rate. The patient had a high pulse rate since the time of the surgery in the early morning hours, and that pulse rate had persisted at an elevated level throughout the day, and I think steps should have been taken to explain why that pulse rate was elevated.

Q. Doctor, what are the steps which in your opinion would have been in accordance with the accepted standard of medical practice in 1978 for Dr. Hughes to have taken, given the status of the patient at the time you saw her at 4:30 on the afternoon of the 13th?

A. A number of things should have been done.

First of all, there are a number of different reasons someone can have a high pulse rate, but in a situation like this, it is my feeling that the physician is obligated to anticipate potential complications.

And two complications that should have been anticipated in a patient who was just in an automobile accident were one, a respiratory complication such as fat embolization—a very common cause and frequent cause of a high pulse rate is a low blood oxygen. I think steps should have been taken to investigate that.

The other possible cause of a high pulse rate in a situation like this is that the patient may have been bleeding internally. A repeat measurement of the patient's blood count, such as a hemoglobin, should have been obtained. The high pulse rate that day could have been due to internal bleeding as well as it could have been due to a respiratory complication.

It is my feeling that certain things should have been done to ascertain why the pulse rate was persistently elevated.

*Id.* at 212–15.

The testimony was unshaken on cross-examination. It further established that there were two medical procedures, administration of steroids and oxygen, that, if prescribed

early, would have had a high probability of preventing Susanne's death. Appellee's expert attributed Susanne's death to appellant's failure to diagnose and treat the cause of the increased heart rate and failure to administer the prescribed medication (valium) to prevent the oxygen tube from dislodging. Other medical evidence introduced at trial established that the recovery rate for f.e.s. is approximately eighty percent.

In its defense, appellant's experts and the two attending physicians testified that their conduct did not deviate from established medical procedure. They noted that Susanne only displayed one of the signs of f.e.s., elevated pulse, and that that sign was not significantly abnormal until it became 140. Dr. Hughes and Dr. Newcomer both testified that tests for f.e.s. were not performed because her pulse, while high, was stable. Both eliminated the existence of f.e.s. based on their clinical observations, absence of rash, during their examinations. They were cross-examined with an article that demonstrated that the early stage of f.e.s. is normally indicated by two symptoms and that a rash appears in the latter stages of the disease.

■ We believe this evidence establishes the following. Appellee's evidence of liability was strong and convincing. Appellant had no affirmative defenses such as assumption of the risk or contributory negligence. As the decedent was young, the jury had a highly sympathetic situation to consider. The potential verdict was substantially higher than that entered.[2] Appellee made a reasonable settlement demand. Appellant made no offer.

All these factors support the imposition of delay damages. In light of appellee's demand of $300,000, it is unquestionable that this case could have been settled for less than the verdict entered, and appellant could have avoided delay damages by engaging in reasonable settle-

2. Appellee's expert projected Susanne's earnings to be $860,000 to $1,343,000, with forty percent to be spent on living expenses.

ment negotiations in a lawsuit where the evidence of liability was strong.

ORDER AFFIRMED.