Ruth S. RITTENHOUSE, Administratrix of the Estate of John Rittenhouse, Deceased, Appellee,

v.

Gerald E. HANKS, M.D., Anthony D'Amico, M.D., and American Oncological Hospital of the Fox Chase Cancer Center.

Appeal of Gerald E. Hanks, M.D. and American Oncological Hospital of the Fox Chase Cancer Center.

Ruth S. Rittenhouse, Administratrix of the Estate of John Rittenhouse, Deceased, Appellee,

v.

Gerald E. Hanks, M.D., Anthony D'Amico, M.D., and American Oncological Hospital of the Fox Chase Cancer Center.

Appeal of Gerald E. Hanks, M.D. and American Oncological Hospital of the Fox Chase Cancer Center.

Ruth S. Rittenhouse, Administratrix of the Estate of John Rittenhouse, Deceased, Appellee,

v.

Gerald E. Hanks, M.D., Anthony D'Amico, M.D., and American Oncological Hospital of the Fox Chase Cancer Center.

Appeal of Gerald E. Hanks, M.D. and American Oncological Hospital Of The Fox Chase Cancer Center.

Superior Court of Pennsylvania.

Argued Feb. 27, 2001.
Filed May 16, 2001.
Reargument Denied July 19, 2001.

Barbara S. Magen, Philadelphia, for appellants.

Benedict A. Casey, Philadelphia, for appellee.

Before DEL SOLE, P.J., EAKIN and LALLY–GREEN, JJ.

DEL SOLE, P.J.:

¶ 1 Gerald E. Hanks, M.D., and American Oncological Hospital of the Fox Chase Cancer Center (collectively "Appellants") appeal the judgment entered against them in this medical malpractice action. We affirm.

¶ 2 Appellee, Ruth S. Rittenhouse, administratrix of the estate of her husband John Rittenhouse, brought this action alleging the negligence of Dr. Hanks, John's attending physician, Dr. Anthony D'Amico, a resident, and their employer Fox Chase. A nonsuit was entered in favor of Dr. D'Amico. As to Dr. Hanks, however, the jury found he was negligent and that his negligence was a substantial factor in causing John's death. The jury awarded damages in the amount of $2.5 million. Appellee filed a motion for delay damages in the amount of $864,880 which the court granted. Appellants' posttrial motions were denied and judgment was entered. Appellants' motion to reduce the amount of security on appeal was also denied. Appellants' appeal from that denial was consolidated with the appeal from the judgment.[1]

¶ 3 The genesis of Appellee's claim is John's death from liver failure caused by the side effects of Eulexin, one of the medications which Dr. Hanks prescribed for the treatment of prostate cancer. Appellee contended that John showed symptoms of liver damage but Dr. Hanks did not realize the risk of liver injury from Eulexin and thus did not perform a liver function study until it was too late to reverse the damage. On appeal, Appellants claim the verdict was against the weight of the evidence, that the trial court erred in various evidentiary rulings and jury instructions, that they are entitled to a modification of the award of delay damages, and that the trial court erred in denying their motion to reduce the amount of security on appeal.

 ¶ 4 Appellants' first evidentiary claim[2] is that the trial court erred in admitting the opinion testimony of Appellee's expert witness, Dr. Meller, as he was not qualified to testify on this subject matter. The standard for qualifying an expert witness is liberal; if the witness has any reasonable pretension to specialized knowledge on a subject, he may testify and the weight to be given to the testimony is for the trier of fact. *Miller v. Brass Rail Tavern,* 541 Pa. 474, 664 A.2d 525 (1995). Moreover, the qualification of an expert witness rests within the sound discretion of the trial judge and, absent an abuse of that discretion, the decision of the trial judge should be upheld. *Id.*

 ¶ 5 Dr. Meller testified that he is a board-certified urologist and his practice involves the diagnosis and treatment of disorders of the prostate and genitourinary system. Approximately half of his practice involves the treatment of prostate disorders, including prostate cancer. Appellants' contention that Dr. Meller was not qualified because he is not a radiation oncologist is unavailing since experts in one area of medicine may be found qualified to address other areas of specialization where the specialties overlap in practice or where the specialist has had experience in a related field of medicine. *See, e.g., Lira v. Albert Einstein Medical Center,* 384 Pa.Super. 503, 559 A.2d 550 (1989) (neurologist with some training in otolaryngology competent to render expert testimony on conduct of otolaryngologist). On this record, we conclude that the trial court did not abuse its

---

1. The appeal at 1998 EDA 1999 is from the trial court's order denying reconsideration of its order granting delay damages. Since an order denying reconsideration is not an appealable order, we quash that appeal.

2. In their brief, Appellants' first claim is that the verdict is against the weight of the evidence. As this claim is based, at least in part, on certain alleged evidentiary errors, we find it more appropriate to dispose of the evidentiary claims first.

discretion in allowing Dr. Meller to testify as an expert.

■ ¶ 6 Appellants next contend that the trial court erred in allowing testimony from Dr. Meller, Dr. Hanks, and Dr. Porter [3] concerning their individual practices rather than the community standard of care. Initially, we note that there was no objection made to Dr. Porter's testimony. Therefore any challenge to his testimony on this basis has not been preserved for review. *Takes v. Metropolitan Edison Co.*, 548 Pa. 92, 695 A.2d 397 (1997).

■ ¶ 7 As to Dr. Meller, Appellants' specific objection is that when answering the question of what is required of a physician providing Eulexin to a patient, Dr. Meller stated:

I always perform liver function testing early, around three weeks, and then around six weeks just to rule out the possibility of a problem with the liver. Even though it is a rare condition, it is the most serious and notable condition that can occur with this drug.

N.T., 5/12/98, at 131. Appellants' argument ignores the ensuing question and answer:

Q. And we are asking here not about what you do, Doctor, but about what you believe the standard of care is for other physicians?

A. I believe that is the standard of care.

*Id.* at 131–132. Thus, the record refutes Appellants' claim since Dr. Meller made clear that he was testifying about the community standard of care.

■ ¶ 8 Appellants further complain that Dr. Hanks was "compelled to provide

testimony as to his own practices." Appellants' Brief at 32. However, as the following excerpt shows, Dr. Hanks was not asked for his own practice but the practice of people in his field.

Q. Dr. Hanks, let me ask that question again in a more direct way. Isn't it true that beginning some time in 1993 or thereafter, you began with patients who were taking Eulexin or flutamide, you began doing liver function studies routinely?

A. Me, personally?

Q. No, people in your field, people in your practice?

N.T., 5/13/98, at 450. Then, although he had been asked for the practice of "people in your field," Dr. Hanks responded "I personally began testing patients immediately after this incident." *Id.* As the questioning continued, Appellants' counsel objected on the basis that this testimony was evidence of subsequent remedial issues. No objection was made that Dr. Hanks was testifying to his own practice rather than the community practice. Thus, the record shows that (a) Dr. Hanks' answer of what he personally did was not responsive to the question of what was the practice of "people in your field" and (b) no objection was made on this basis at trial, so the claim is waived. *Takes*, 548 Pa. 92, 695 A.2d 397. Appellants cannot obtain relief on this basis.

■ ¶ 9 Citing this same testimony by Dr. Hanks, Appellants claim the trial court erred in allowing evidence of standards or practices after 1992 when the only standard of care which was applicable was the standard as it existed in 1992.[4] Appellants further claim the court erred in failing to

---

**3.** Dr. Porter was a defense witness.

**4.** Appellants also claim error in admitting Dr. Porter's testimony of standards after 1992. Again, however, Appellants have failed to pre-

serve this claim for review as they made no objection to Dr. Porter's testimony. *Takes,* 548 Pa. 92, 695 A.2d 397.

instruct the jury that evidence elicited about standards after 1992 should be ignored.

¶ 10 After reviewing the record, we conclude, as did the trial court, that Appellants first raised questions about post 1992 standards in their cross-examination of Dr. Meller and their direct examination of Dr. Hanks. Since Appellants opened the door with their own questions, they cannot now complain that Appellee followed with similar questions. *Commonwealth v. Reid,* 537 Pa. 167, 642 A.2d 453 (1994).

 ¶ 11 Appellants further contend that the trial court should have instructed the jury to disregard this evidence as it did not relate to the time of the treatment. The purpose of a jury charge is to clarify the legal principles at issue. *General Equip. Mfrs. v. Westfield Ins. Co.,* 430 Pa.Super. 526, 635 A.2d 173, 184 (1993), *appeal denied,* 537 Pa. 663, 644 A.2d 1200 (1994). Thus, a jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations. *Von der Heide v. Commonwealth Dept. of Transp.,* 553 Pa. 120, 718 A.2d 286, 290 (1988). Here the trial court instructed the jury that a specialist such as Dr. Hanks "must have and use the same knowledge and skill and exercise the same care as that which is usually had and exercised by other specialists in the same medical specialty **at the time of the treatment of his patient.**" N.T., 5/14/98, at 567–68 (emphasis added). The emphasized language sets forth the very point Appellants sought to convey by their requested charge, albeit in different language. We cannot conclude that the court's charge was erroneous. *See Commonwealth v. Ohle,* 503 Pa. 566, 470 A.2d 61 (1983) (trial court is not required to accept the precise

words of a requested point for charge as long as the charge adequately, accurately and clearly explains the appropriate points of law to the jury).

 ¶ 12 Appellants next claim that the trial court erred in restricting Dr. Brownstein's testimony and in refusing to charge the jury on the "two schools of thought" doctrine regarding the use of hormonal/radiation therapy as opposed to surgery. On review of the record, we find that the court did not restrict Dr. Brownstein's testimony as he did in fact discuss the two different treatments for prostate cancer and why he believed the hormonal/radiation treatment was more appropriate than surgery in this instance. More importantly, however, Appellee did not allege that Dr. Hanks was negligent for recommending hormonal/radiation treatment over surgery. Rather, Appellee's allegation has consistently been that Dr. Hanks was negligent for not appropriately monitoring the liver functions in light of the risk of liver damage from Eulexin treatment. As the trial court noted, "This is a red herring," Trial Court Opinion, 7/26/00, at 7, as there was no "two schools of thought" issue in this case. *See Schaefer v. Stewartstown Dev. Co.,* 436 Pa.Super. 354, 647 A.2d 945, 947 (1994) (trial judge is bound to charge the jury only on the law applicable to the factual parameters of a particular case and may not instruct the jury on law inapplicable to the matter before it).

 ¶ 13 Appellants also complain that the trial court erred in refusing to allow Dr. D'Amico and Dr. Brownstein to read from the PDR[5] listing for Eulexin and the rarity of the side effect of liver damage. The admission or exclusion of evidence is

---

**5.** The PDR, or Physician's Desk Reference, is a listing of drugs and their uses and side effects.

within the sound discretion of the trial court and will not be reversed absent a clear abuse of that discretion. *Catina v. Maree,* 272 Pa.Super. 247, 415 A.2d 413 (1979). Having reviewed the record, we agree with the trial court that this evidence would have been cumulative and thus its exclusion could not have prejudiced Appellants. The entire PDR listing for Eulexin had been admitted into evidence and Appellee's witnesses had already discussed the information contained therein. Since the information was already before the jury, it was not error to refuse to allow Appellants to repeat it.

¶ 14 We now turn to Appellants' first claim, that the verdict was against the weight of the evidence. A new trial will not be granted on the basis of a weight of the evidence claim unless the evidence supporting the verdict is so inherently improbable or at variance with admitted or proven facts or with ordinary experience as to render the verdict shocking to the court's sense of justice. *Brindley v. Woodland Village Restaurant,* 438 Pa.Super. 385, 652 A.2d 865 (1995). We will reverse the determination of the trial court only if the trial court acted capriciously or palpably abused its discretion. *Id.* Having found no evidentiary errors in the trial court's handling of the trial and having reviewed the evidence presented, we are unable to conclude that the trial court acted capriciously in finding that the verdict was not against the weight of the evidence.

¶ 15 Appellants also claim error in the court's additional charge to the jury, in response to the jury's request for further guidelines for determining compensatory damages. The challenged instruction is as follows:

> Also under the Wrongful Death Act, the plaintiff is entitled to be awarded a sum which will fairly and adequately

compensate her for the pecuniary value, the monetary value, the services, the society and comfort that her husband, the decedent, would have given to her had he lived from the time that the injury was suffered, from the time you find the injury was suffered on into his life expectancy, and the things that this included are the value of such elements of work he would have done around the home, provision of physical comfort and services to her, sometimes called consortium, the same thing as a provision of society and comfort.

N.T., 5/14/98, at 582. With the exception of the use of the word "consortium," this additional instruction set forth the exact same elements of damages as did the court's original instruction:

> Under the Wrongful Death Act, the damages recoverable by the plaintiff are as follows:

> Plaintiff is entitled to be awarded a sum which will fairly and adequately compensate her for the pecuniary value of the services, society and comfort the decedent would have given to his wife had he lived from the time of his injury to the end of his life expectancy.

> And these include such elements as work around the home, the provision of physical comforts and services and the provision of society and comfort to his wife.

*Id.* at 573.

¶ 16 Appellants rely primarily on *Linebaugh v. Lehr,* 351 Pa.Super. 135, 505 A.2d 303 (1986), for the proposition that loss of consortium is not an element of damages in a wrongful death action. In *Linebaugh,* we held that there can be no separate claim for loss of consortium because recovery in a wrongful death action includes damages for the loss of the decedent's society, which is also the essential nature

of a claim for loss of consortium. Thus, to allow a surviving spouse to maintain a separate cause of action for loss of consortium in addition to the action brought under the wrongful death statute would permit a double recovery for the same death.

¶ 17 Presently, Appellee did not seek to bring a separate action for loss of consortium nor did the trial court instruct the jury to award separate damages for loss of consortium. Rather, in this, as in any wrongful death action, Appellee is entitled to recover for the value of services, society and comfort she would have received had her husband lived. *Walton v. Avco Corp.*, 383 Pa.Super. 518, 557 A.2d 372 (1989); *Buchecker v. Reading Co.*, 271 Pa.Super. 35, 412 A.2d 147 (1979). This is what the trial court's instructions conveyed. As noted in *Linebaugh*, this element of damages is essentially the same as the damages awarded on a loss of consortium claim. The trial court's use of the word "consortium" did not lead the jury to award a double recovery. It was merely a term that described that element of damages which includes the services, society and comfort of the decedent. There was no error.

¶ 18 Appellants next contend they are entitled to modification of the award of delay damages. Citing *Kuchak v. Lancaster General Hospital*, 377 Pa.Super. 288, 547 A.2d 372 (1988), Appellants claim that a trial court is not permitted to award delay damages for the period of time between the production of a plaintiff's expert report and the production of the defendant's expert report. In *Kuchak*, the trial court found that the plaintiff proceeded expeditiously in preparing the action for trial but that not providing the initial expert medical report diminished the possibility of an offer of settlement. The trial court therefore excluded from the calculation of delay damages the period of time between the dates of both parties' initial expert reports. Significantly, the plaintiff did not appeal from that portion of the order and this Court did not have that issue before it. The trial court's explanation for excluding this time was set forth in our opinion in *Kuchak* as part of the background of the case only and does not represent a holding of this Court since that issue was not raised before this Court. Thus, Appellants' claim that *Kuchak* mandates a similar result in the present case is incorrect.

¶ 19 Moreover, although Appellants cursorily referred to various excludable time periods, including this time period, in their response to Appellee's motion for delay damages, at argument Appellants abandoned these claims:

THE COURT: Did you look that over? Is that an accurate calculation?

MR. POST: Under the current state of the law, Your Honor, it is. We have disputed it on constitutional grounds, which under the—

THE COURT: Not arithmetically?

MR. POST: No, sir.

N.T., 6/4/99, at 2. Since Appellants specifically advised the trial court that they were disputing the award of delay damages solely on constitutional grounds, and not on the ground that any particular period of time should be excluded from the calculation of delay damages, they have abandoned this claim and the trial court cannot be faulted for failing to exclude this time period from the calculation of delay damages.

¶ 20 Finally, Appellants contend the trial court erred in refusing to reduce the amount of security on appeal. Appellants claim that the Medical Professional Liability Catastrophe Loss Fund (CAT Fund) is responsible for a portion of the judgment and the security should be reduced to cov-

er only that portion of the judgment for which Appellants are insured through their primary carrier. Because there is no record support for Appellants' factual claims, we are unable to grant relief on this basis. Appellants filed a motion to reduce security, alleging that Dr. Hanks and Fox Chase each have primary coverage limited to $200,000 and have excess coverage of at least $2,000,000 pursuant to the CAT Fund. As the CAT Fund is exempt from posting security, Appellants sought to reduce the amount of security to be posted pending this appeal. Appellee filed a response denying Appellants' averments of fact. Appellants did not thereafter file affidavits, take depositions, or request a hearing to support their averments of fact. Thus, there is no record support for Appellants' claim and Appellants cannot obtain relief on this basis.

¶ 21 Accordingly, as there is no merit to any of Appellants' claims, we affirm the judgment.

¶ 22 Appeal at 1998 EDA 1999 quashed. Order denying motion to reduce security on appeal affirmed. Judgment affirmed.