## Weiner v. Fisher

*Glenn C. McCarthy,* for appellants.
*Charles Fitzpatrick III,* for appellees.

TERESHKO, *J.,* June 11, 2004—

## PROCEDURAL HISTORY

This appeal by plaintiffs, Shirley Weiner as executrix of the estate of Leon Weiner and Shirley Weiner individually, arose as a result of this court granting defendant's oral motion in limine to preclude plaintiffs' expert Dr. William Bisordi and the court's granting of defendant's oral motion for compulsory nonsuit thereafter.

## FACTUAL BACKGROUND

In March of 1990, Dr. Leon Weiner visited Dr. Robert Fisher because he was concerned that he was a high risk for stomach cancer and was experiencing some hoarseness in his throat, along with some esophageal problems. At the time of the visit, Dr. Weiner was a 64-year-old physician who was partially retired from his practice in gerontology, which is the care for the elderly. Dr. Fisher is a professor of medicine at Temple University and the chief of the gastroenterology division. Dr. Fisher specializes in esophageal diseases. On Dr. Weiner's first visit Dr. Fisher made extensive notes, including that Dr. Weiner had a family history of gastrointestinal malignancy. (N.T. dated 3/3/03 p. 34 a.m. session.) After this visit Dr. Fisher ordered a series of tests to establish whether Dr. Weiner had intestinal metaplasia[1] and atrophic gastritis,[2] which is evidence and support of perni-

---

1. A change of normal tissue cells into an abnormal form in response to chronic stress or injury.

2. A long-term inflammation of the stomach, with the breakdown of the mucous membranes of the stomach.

cious anemia.[3] (N.T. dated 3/3/03 p. 48 a.m. session.) The tests included an endoscopy[4] with six biopsies performed, a colonoscopy[5] and an abdominal ultrasound. (N.T. dated 3/3/03 pp. 14-15 a.m. session.) In addition, Dr. Fisher requested a Schilling's test,[6] the purpose of which was to confirm a diagnosis of pernicious anemia. (N.T. dated 3/3/03 pp.14-15 a.m. session.) After these series of tests were performed, Dr. Fisher confirmed that Dr. Weiner had pernicious anemia, intestinal metaplasia, and atrophic gastritis. At that time Dr. Fisher met with Dr. Weiner and spoke to him about returning in four or five years for follow-up, but emphasized that he could return at any time if he had any symptoms, or needed to be seen sooner. (N.T. dated 3/3/03 p. 23 a.m. session.)

In May 1994, Dr. Weiner returned to Dr. Fisher with complaints of nausea and vomiting, which is synonymous with upper gastrointestinal complications. Dr. Fisher subsequently ordered an upper endoscope to see if there were any lesions. The upper endoscopy did not reveal any suspicious findings, which would require a biopsy to determine whether Dr. Weiner had cancer or not. Dr. Fisher again made extensive notes to Dr. Weiner's medical file and spent approximately 45 minutes with

---

3. A disorder with inadequate making of the blood cells caused by a lack of iron, folic acid, or vitamin B12 or other food disorders.

4. A procedure where a fiberoptic tube is placed down from the mouth through the esophagus and into the stomach where random samples of tissue cultures are taken.

5. An elongated flexible fiberoptic tube that permits visual examination of the colon.

6. A procedure where the percentage of radioactivity is measured in a person's urine, the results of which are used in the diagnosis of pernicious anemia and other disorders of vitamin B12 metabolism.

Dr. Weiner discussing a care plan. Dr. Fisher explained that Dr. Weiner did not have to return for four to five years, however Dr. Weiner should come back any time he felt he needed to.

In June of 1998, Dr. Weiner made his last visit to Dr. Fisher. Dr. Fisher stated that Dr. Weiner presented with less upper gastrointestinal symptoms in 1998 than he had in either 1990 or 1994. (N.T. dated 3/3/03 pp. 50-51 a.m. session.) Conversely, Dr. Weiner complained of lower gastrointestinal complications, which included change in bowel habits. Dr. Fisher ordered that a colonoscopy be performed. Because of medical testing in conjunction with subsequent fainting spells and Parkinson's disease, Dr. Weiner had to postpone his colonoscopy until December 10, 1998. The colonoscopy revealed some diverticulosis,[7] but was otherwise normal. (Complaint dated 2/21/01 p. 3, ¶10.)

Approximately three weeks after his colonoscopy, Dr. Weiner went to see an ophthalmologist in Miami, Florida, about his eyesight. His ophthalmologist noticed an abnormality in Dr. Weiner's blood work evidencing anemia and low hemoglobin and began to question Dr. Weiner about his medical history. (N.T. dated 3/3/03 p. 13 a.m. session.) Upon hearing Dr. Weiner's family history of gastrointestinal cancer, the ophthalmologist said he wanted Dr. Weiner to see another gastroenterologist, Dr. Marc Carp, located in Miami. (Complaint dated 2/21/01 p. 3, ¶11.)

--------

7. A pouch-like bulging through the muscular layer of the colon without inflammation.

The next week Dr. Carp performed an endoscope with biopsies and diagnosed Dr. Weiner with gastric cancer. On January 13, 1999, Dr. Weiner underwent a total gastrectomy at the hospital of the University of Pennsylvania. (Complaint dated 2/21/01 p. 4, ¶12.) Thereafter, Dr. Weiner continued to receive treatment of the gastric cancer for over one year until his death on February 7, 2000. Dr. Weiner was 74 years old at the time of his death.

On February 21, 2001, Shirley Weiner filed a complaint as executrix of the estate of Leon J. Weiner and in her own right (plaintiffs) against Dr. Robert Fisher M.D. (defendant). The plaintiffs alleged in their complaint that Dr. Fisher failed to properly evaluate, diagnose, monitor and treat Dr. Weiner's gastrointestinal cancer. Trial commenced in this case on March 3, 2003. During trial, the court found that plaintiffs' expert, Dr. William Bisordi, was not qualified as an expert in gastroenterology and, therefore, was prohibited from testifying as to the standard of care in gastrointestinal endoscopy. As a result, the court granted defendant's oral motion for nonsuit on March 3, 2003.

Plaintiffs have since filed their notice of appeal and submitted their 1925 statement accordingly.

The issues before this court are as follows:

(1) Whether the trial court committed an error of law or abused its discretion in determining Dr. Bisordi was not qualified as an expert medical witness under section 512 of the MCare Act because he was not engaged in or retired from actual clinical practice or teaching within five years of his testimony.

(2) Whether section 512 of the MCare Act is unconstitutional because it violates separation of powers, the

equal protection clause and the due process clause of the United States and Pennsylvania Constitutions.

## LEGAL ANALYSIS

### I. *Expert Qualifications*

At the time of trial the plaintiffs called Dr. Bisordi as an expert witness. The plaintiffs contend that their medical expert, Dr. Bisordi, was qualified to give an expert opinion as to the standard of care in gastroenterology and that Dr. Bisordi would have testified Dr. Fisher departed from the standard of care by not ordering biopsies after Dr. Weiner's endoscopy in 1994. The trial court precluded Dr. Bisordi from testifying as an expert because he did not satisfy section 512(b)(2) of the MCare Act. Dr. Bisordi had not actively performed endoscopies since 1995, nor has he taught the principles of endoscopy within the requisite five years from the time of trial. (N.T. dated 3/3/03 pp. 12, 16-17, p.m. session.)

"Whether a witness has been properly qualified to give expert witness testimony is vested in the discretion of the trial court." *Kovalev v. Sowell,* 839 A.2d 359, 362 (Pa. Super. 2003). The Pennsylvania Superior Court reviews challenges to a trial court's qualification of an expert witness under an "abuse of discretion" standard. *Reading Radio Inc. v. Fink,* 833 A.2d 199 (Pa. Super. 2003) (citing *Miller v. Brass Rail Tavern Inc.,* 541 Pa. 474, 481, 664 A.2d 525, 528 (1995)).

The applicable statutory law for determining the qualifications of a medical expert is the Medical Care Availability and Reduction of Error Act, also known as the

MCare Act (40 P.S. §1303.512), which addresses the matter of expert qualifications as follows:

"(a) *General rule.* No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

"(b) *Medical testimony.* An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

"(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

*"(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.* (emphasis added)

"Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

"(c) *Standard of care.* In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

"(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

"(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

"(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

"(d) *Care outside specialty.* A court may waive the same subspecialty requirement for an expert testifying on the standard of care for the diagnosis or treatment of a condition if the court determines that

"(1) The expert is trained in the diagnosis or treatment of the condition, as applicable; and

"(2) The defendant physician provided care for that condition and such care was not within the physician's specialty or competence.

"(e) *Otherwise adequate training, experience and knowledge. A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.*" (emphasis added)

Despite the lack of any mention in section 512(b)(2) itself, plaintiffs argue that in order for an expert to be qualified under section 512(b)(2) of the MCare Act, he

or she must have been either teaching in the field or actively practicing within five years *from the time of the alleged negligent conduct.* (emphasis added) However, according to the plain meaning of the statute, qualification under section 512(b)(2) requires the expert to have taught or actively practiced medicine in the specialized area which he is going to testify within five years from the date of trial testimony.

## A. Statutory Construction—Plain Meaning

We begin our analysis by looking at the plain meaning of section 512(b) of the MCare Act for statutory interpretation.

One of the reasons the General Assembly passed the MCare Act was to limit the admissibility of expert testimony in medical malpractice cases. *Gartland v. Rosenthal,* 2004 WL 869583, *3 (Pa. Super. 2004).

When interpreting a statute, the court must begin with the plain meaning of the language used in the statute. *Ludmer v. Nernberg,* 699 A.2d 764, 765 (Pa. Super. 1997). Our canons of statutory interpretation instruct that the plain words of a statute cannot be disregarded where the language is free and clear from ambiguity. *Price v. Pennsylvania Property and Casualty Insurance Guaranty Association,* 795 A.2d 407, 412 (Pa. Super. 2002), *appeal denied,* 573 Pa. 698, 825 A.2d 1262 (2003); 1 Pa.C.S. §1921(b). When a statute's meaning is plain, there is no occasion to further resort to rules of statutory interpretation when doing so would alter the plain meaning of the statute. *Price,* 795 A.2d at 412. Thus, the plain language of a statute is the best indication of legislative

intent. *Commonwealth v. Gilmour Manufacturing Co.,* 573 Pa. 143, 822 A.2d 676 (2003).

In addition, any words having a precise and well-settled legal meaning must be given that meaning when they appear in statutes unless there is a clear expression of legislative intent to the contrary. *McGinness Unemployment Compensation Case,* 177 Pa. Super. 104, 110 A.2d 918 (1955).

According to 40 P.S. §1303.512(b), which is titled *"Medical testimony,"* An expert *"testifying"* on a medical matter must: (1) possess an unrestricted physician's license to practice medicine in any state; and (2) be engaged in or retired within the previous five years from active clinical practice or teaching.

It should be further noted that in construing statutory language, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage . . . ." *Bowser v. Blom,* 569 Pa. 609, 617, 807 A.2d 830, 835 (2002); 1 Pa.C.S. §1903.

In construing plain meaning of the statute we must first begin with the term *"Medical testimony"* in the title of section 512(b). The usage of the term "medical testimony" indicates section 512(b) encompasses requirements which must be satisfied while the expert is giving his medical testimony and not prior thereto. Furthermore, the introductory language of section 512(b) which reads "an expert *'testifying'* on a medical matter . . ." illustrates, according to its proper grammar usage, that the expert must satisfy both subsections of section 512(b) at the time he is presently *testifying* in court. Since the plain meaning of the title and language section 512(b) unam-

biguously requires experts to be practicing or teaching in the specialized area within five years from the date his or her medical testimony is given, the court's need to explore the legislative history or add meaning to the statute becomes unnecessary and, if undertaken, would violate statutory and common-law prohibitions against the same.

This court also addressed the issue whether Dr. Bisordi was eligible for a waiver of the requirements of section 512(b) if according to section 512(e) Dr. Bisordi: "possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period." However, the court reasoned that, although Dr. Bisordi was actively teaching, he was not teaching in the specialized field of endoscopy which is the specialty he was being offered to testify in. (N.T. dated 3/3/03 p. 12 p.m. session.) For these reasons Dr. Bisordi would not qualify for a waiver of the requirements of section 512(b).

The plaintiffs argue the same position as is stated in *Spotts v. Small,* 61 D.&C.4th 225 (Lancaster Cty. 2003), that in order for an expert to be qualified under section 512(b) he or she must have been either teaching in the field or actively practicing within five years from the time of the alleged negligent conduct.

The *Spotts* court contends in their legislative intent argument that the General Assembly's failure to use the phrase "as of the time of the . . . breach of the standard of care" in section 512(b)(2) as it did in section 512(c)(1)

which addresses the same subject matter does not prohibit the court from construing the two sections consistently. *Spotts,* 61 D.&C.4th at 236. This position appears to be inconsistent with Pennsylvania law.

In determining legislative intent, sections of a statute must be read together and construed with reference to the entire statute. 1 Pa.C.S. §1921(a). Where the legislature includes specific language in one section of the statute and excludes it from another, the language should not be implied where excluded. *Fonner v. Shandon Inc.,* 555 Pa. 370, 378, 724 A.2d 903, 907 (1999). A change of language in separate provisions of a statute is prima facie evidence of a change of intent. *Walker v. Roney,* 407 Pa. Super. 620, 622-23, 595 A.2d 1318, 1319 (1991). Where a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent. *Fonner,* 555 Pa. at 378-79, 724 A.2d at 907 (citing *Commonwealth v. Bigelow,* 484 Pa. 476, 484, 399 A.2d 392, 395 (1979)).

In *Fonner,* our Supreme Court found that the General Assembly included the specific language of the "unless" clause in one section of the Workers' Compensation Act (section 302(b)) but did not include it in another section of the Act (section 203). The court held that in accordance with the rules of statutory interpretation, the "unless" clause of section 302(b) cannot be implied to amend section 203. Furthermore, the fact that the General Assembly omitted the "unless" clause from section 203 shows that the General Assembly had a different intent when drafting section 203 (extending immunity to statutory employer from negligence cases) than it did when draft-

ing section 302(b) (providing security for payment of benefits to injured employee).

In this case, section 512(b) and section 512(c) are likewise similar provisions of the MCare Act because they both deal with testimony of a medical expert. However, the use of the phrase "as of the time of the breach of the standard of care" in section 512(c)(1) indicates that the General Assembly was mindful of this phrase in constructing section 512 and intended a different meaning by not including this phrase in section 512(b). According to the above-mentioned case law, absence of the phrase from section 512(b) is prima facie evidence of a change in legislative intent and is therefore not indicative of the legislature's intent to construe the two sections consistently.

In addition to discussing the abundant case law supporting this court's position that the plain meaning of the statute governs the interpretation of section 512 of the MCare Act, we will also address this issue from a policy standpoint.

## B. Policy Analysis

The qualification of an expert witness during trial allows the trial court to examine the specific training and experience of a potential expert witness on the record so that the trial court may ascertain whether that witness qualifies as an expert in the field at issue. *Rittenhouse v. Hanks,* 777 A.2d 1113 (Pa. Super. 2001). Expert qualification during trial also provides the jury with a basis on which to determine the expert's credibility. *Rauch v. Mike-Mayer,* 783 A.2d 815, 823 n.6 (Pa. Super. 2001).

In *Rauch,* the court implicitly reasoned that the appropriate place for an expert to be evaluated for his training and experience would be during trial. *Id.* The issue of expert qualification is one of credibility and it would be particularly arduous for a jury to scrutinize the credibility of an expert whose qualifications are something far in the past.

Thus, in construing the terms of section 512(b) using the plain meaning, along with taking into consideration the policy matters, the trial court was doing no more than following the plain language of the legislature under section 512(b), which requires the expert to have taught or actively practiced medicine in the specialized area which he is going to testify within five years from the date of trial. Additionally, the fact that Dr. Bisordi was not actively practicing or teaching endoscopy since 1995 and given that Dr. Weiner's trial did not take place until June 2003 indicates that the trial court was keeping faith with the plain meaning of the statute in precluding Dr. Bisordi's testimony and report.

## II. *Separation of Powers*

In their post-trial motions and 1925(b) statement, plaintiffs challenge the constitutionality of section 512 of the MCare Act. Their position is that it usurps the Supreme Court's authority to govern procedure in the courts of the Commonwealth in violation of Article V, Section 10 of the Pennsylvania Constitution.

Article 10(c) of the Pennsylvania Constitution provides:

"(c) The Supreme Court shall have the power to prescribe general rules governing practice, procedure and

the conduct of all courts, . . . . All laws shall be suspended to the extent that they are inconsistent with rules prescribed under these provisions."

Our analysis begins with the strong presumption of constitutionality and the heavy burden of persuasion upon one who challenges the constitutionality of an Act of the General Assembly. *Snider v. Thornburgh,* 496 Pa. 159, 166, 436 A.2d 593, 596 (1981). Accordingly, legislation will not be declared unconstitutional unless it *"clearly, palpably* and *plainly* violates the constitution." *Snider,* 496 Pa. at 166, 436 A.2d at 596. (emphasis in original) Consequently, all doubts relating to the constitutionality of such an enactment must be resolved in its favor. *Edmonds by James v. Western Pennsylvania Hospital Radiology Associates,* 414 Pa. Super. 567, 574, 607 A.2d 1083, 1087 (1992). Thus, it is clear that a party raising a constitutional challenge has a heavy burden of rebutting the presumption of constitutionality and demonstrating that the statute clearly, plainly, and palpably violates constitutional precepts. *Edmonds by James,* 414 Pa. Super. at 574, 607 A.2d at 1087.

The legislature retains the right to prescribe new rules of evidence provided they do not deprive a person of his or her constitutional rights. *Dranzo v. Winterhalter,* 395 Pa. Super. 578, 589, 577 A.2d 1349, 1354 (1990). The Pennsylvania Supreme Court has, in the past, recognized the right of the legislature to create or alter rules of evidence. *Rich Hill Coal Company v. Bashore,* 334 Pa. 449, 485, 7 A.2d 302, 319 (1939). This right of the legislature is still recognized by our Supreme Court today. *Commonwealth v. Newman,* 534 Pa. 424, 429, 633 A.2d 1069, 1071 (1993). Such legislative action does not violate

separation of powers between the legislative and judicial branches. *Id.*

This court is mindful of the case of *McGlaughlin v. Gettysburg Hospital,* 63 D.&C.4th 504 (Adams Cty. 2003), and adopts the rationale for upholding the constitutionality of section 512 of the MCare Act. As stated in *McGlaughlin,* section 512 of the MCare Act addresses the competency of an expert to offer an expert medical opinion in a medical professional liability action. The court in *McGlaughlin* stated, "[o]ne need look no further than the Pennsylvania Rules of Evidence . . . to conclude that this section of MCare is a rule of evidence." *Id.* at 511. While Pennsylvania Rule of Evidence 601 relates to the competency of a witness, Pa.R.E. 702 specifically addresses expert witness testimony. *Id.* Rule 601 states that "[e]very person is competent to be a witness *except as otherwise provided by statute* . . . ." *Id.* at 512. (emphasis in original) Thus, the very rule the Supreme Court adopted under the authority of Article V, Section 10(c), of the Pennsylvania Constitution recognizes the legislature's authority to regulate in this area. *Id.*

It should also be noted that section 512 does not conflict with Pa.R.E. 702 in any manner which would distinguish its application as a rule of evidence for purposes of constitutional analysis. Pa.R.E. 702 does not change the Pennsylvania rule for qualifying a witness to testify as an expert. *Miller v. Brass Rail Tavern Inc.,* 541 Pa. 474, 480-81, 664 A.2d 525, 528 (1995). Rule 702 provides that "a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." It is clear that section 512 simply defines the level of "knowledge,

skill, experience and training" necessary to qualify a witness as an expert in medical malpractice cases.

Accordingly we conclude that 40 P.S. §1303.512 of the MCare Act is not an unconstitutional infringement upon the rule-making authority of the Pennsylvania Supreme Court and therefore does not violate the separation of powers under the Pennsylvania Constitution Article V, Section 10.

### III. *Equal Protection & Due Process Analysis*

Plaintiffs argue that the provisions of section 512 of the MCare Act violate the equal protection and substantive due process laws guaranteed under the Fourteenth Amendment of the U.S. Constitution and the Pennsylvania Constitution. Plaintiffs' position is that section 512 imposes certain requirements for experts in medical malpractice actions that are arguably different than those in other types of actions because the occupation and the profession of the defendants are different; therefore it violates the state and federal equal protection laws.

As in our separation of powers analysis, doubts regarding the constitutionality of an enactment must be resolved in favor of constitutional validity[8] and parties challenging the constitutionality of a law bear the burden of rebutting this presumption by "clear, palpable and plain demonstration that the statute violates a constitutional provision." [9] The analysis of equal protection guarantees under the U.S. and Pennsylvania constitutions are

---

8. *Dansby v. Thomas Jefferson University Hospital,* 424 Pa. Super. 549, 553, 623 A.2d 816, 818 (1993).

9. *James v. SEPTA,* 505 Pa. 137, 142, 477 A.2d 1302, 1304 (1984).

guided by the same principles of interpretation. *Lyons v. W.C.A.B. (Pittsburgh Steelers Sports Inc.),* 803 A.2d 857, 860 (Pa. Commw. 2002).

Substantive due process protections afforded under both the state and federal constitutions are analyzed the same and, thus, are coextensive. *Griffin v. SEPTA,* 757 A.2d 448, 452 (Pa. Commw. 2000). The analysis of substantive due process claim is the same analysis as performed under equal protection claim. *Griffin,* 757 A.2d at 452. The standards for evaluating an equal protection challenge to a statute were set forth in the case of *Curtis v. Kline,* 542 Pa. 249, 666 A.2d 265 (1995):

"The essence of the constitutional principle of equal protection under the law is that like persons in like circumstances will be treated similarly. . . . However, it does not require that all persons under all circumstances enjoy identical protection under the law. . . . The right to equal protection under the law does not absolutely prohibit the Commonwealth from classifying individuals for the purpose of receiving different treatment, . . . and does not require equal treatment of people having different needs. . . . The prohibition against treating people differently under the law does not preclude the Commonwealth from resorting to legislative classifications, . . . provided that those classifications are reasonable rather than arbitrary and bear a reasonable relationship to the object of the legislation. . . . In other words, a classification must rest upon some ground of difference which justifies the classification and has a fair and substantial relationship to the object of the legislation." *Curtis,* 524 Pa. at 254-55, 666 A.2d at 267-68.

The first step in an equal protection analysis is to determine which of three types of scrutiny the reviewing court should apply to the challenged classification: strict scrutiny, intermediate scrutiny or rational basis scrutiny. The Supreme Court has set forth these degrees of scrutiny as follows: "(1) classifications which implicate a 'suspect' class or a fundamental right; (2) classifications implicating an 'important' though not fundamental right or a 'sensitive' classification; and (3) classifications which involve none of these. . . . Should the statutory classification in question fall into the first category, the statute is strictly construed in light of a 'compelling' governmental purpose; if the classification falls into the second category, a heightened standard of scrutiny is applied to an 'important' governmental purpose; and if the statutory scheme falls into the third category, the statute is upheld if there is any rational basis for the classification." *Smith v. City of Philadelphia,* 512 Pa. 129, 138, 516 A.2d 306, 311 (1986). (citation omitted) The rational relationship test will apply because medical physicians are neither a suspect class nor a sensitive classification, and the alleged violation of equal protection here (differential treatment based on occupation and profession of physician) does not implicate a fundamentally protected right, nor does it impose on a class of citizens historically victimized by discrimination. Furthermore, statutes that affect only the economic rights of recovery in a tort action were not considered fundamental rights and were subject to the rational relationship test if the law impacted on the economic right to full compensation. *Lyles v. City of Philadelphia,* 88 Pa. Commw. 509, 516, 490 A.2d 936, 941 (1985).

In applying this test, the court must determine if the challenged statute seeks to promote any legitimate state interest and, if so, whether the statute is reasonably calculated to accomplishing that state interest. *Curtis v. Kline*, 524 Pa. at 257, 666 A.2d at 269.

The purpose of the MCare Act is set forth in 40 P.S. §1303.102:

"The General Assembly finds and declares as follows:

"(1) It is the purpose of this Act to ensure that medical care is available in this Commonwealth through a comprehensive and high-quality health care system.

"(2) Access to a full spectrum of hospital services and to highly trained physicians in all specialties must be available across this Commonwealth.

"(3) To maintain this system, medical professional liability insurance has to be obtainable at an affordable and reasonable cost in every geographic region of this Commonwealth.

"(4) A person who has sustained injury or death as a result of medical negligence by a health care provider must be afforded a prompt determination and fair compensation.

"(5) Every effort must be made to reduce and eliminate medical errors by identifying problems and implementing solutions that promote patient safety.

"(6) Recognition and furtherance of all of these elements is essential to the public health, safety and welfare of all the citizens of Pennsylvania."

The MCare Act also contains a statement policy (section 1303.502) applicable to the chapter dealing with

medical professional liability. The chapter titled "Declaration of policy" reads:

"The General Assembly finds and declares that it is the purpose of this chapter to ensure a fair and legal process and reasonable compensation for persons injured due to medical negligence in this Commonwealth. Ensuring the future availability of access to quality health care is a fundamental responsibility that the General Assembly must fulfill as a promise to our children, our parents and our grandparents."

A review of these two sections as well as the various provisions of chapter five of the MCare Act demonstrates that the purpose of this legislation was to strike a balance between the right of a person injured by a medical negligence to recover just compensation and the need to make quality health care available in this Commonwealth by keeping malpractice insurance available at less exorbitant costs to physicians and hospitals. The MCare Act was passed in response to the rising costs and decreasing availability of malpractice insurance which: (1) threatened to cause an exodus of practicing Pennsylvania physicians and, (2) deterred other physicians from establishing a practice in Pennsylvania.

As part of this response, the MCare Act included chapter five. This part of the law was designed to place reasonable limits on damages recoverable and, in the case of section 512, to set forth qualifications for expert witnesses testifying against physicians, particularly in the area of standard of care.

This provision is rationally related to the purposes of the MCare Act in making malpractice insurance rates

lower so as to keep medical care available in the Commonwealth. It does not, as claimed by plaintiff, interfere with the process of ascertaining the truth. It improves this process by requiring that experts who testify against a physician on the crucial issues in medical liability cases are adequately qualified to do so. As a result, the requirements contained in section 512 are not unreasonable or arbitrary. They do not inhibit plaintiff from proving his case but simply require that his or her expert is actually qualified to give the opinion offered. By way of comparison, the courts have upheld much more stringent burdens on the right to recovery in the face of equal protection challenges. In *Lyles v. City of Philadelphia,* it was held that the statutory "caps" on the amount of damages recoverable against Commonwealth parties was rationally related to a legitimate state purpose and therefore constitutional. In *Lyons v. W.C.A.B.,* an injured football player challenged provisions in the workers' compensation law that had the effect of limiting the amount of compensation payable to athletes in certain professional sports but not others. The provision was upheld as a rational justifiable classification even though it treated professional athletes differently than other workers. In *Berninger v. W.C.A.B. (East Hempfield Township),* 761 A.2d 218 (Pa. Commw. 2000), the different classification for mental health injuries as opposed to physical injuries in the workers' compensation law was likewise upheld against an equal protection challenge.

Thus, the provisions of section 512 of the MCare Act are rationally related to the legitimate governmental interest and constitutional under the circumstances.

## CONCLUSION

In consideration of the analysis set forth above, this court believes that the defendants' oral motion in limine and oral motion for compulsory nonsuit were properly granted and should be affirmed by the court above.