Linda MACHADO, Executrix of the Estate of Howard M. Machado, Deceased and Linda Machado, In her Own Right

v.

Barbara K. KUNKEL, M.D., the A.Z. Ritzman Assoc., Inc., Harrisburg Hospital, Joseph Esposito, M.D., Susquehanna Surgeons, Ltd., William Sullivan, M.D., and Holy Spirit Hospital.

Appeal of Holy Spirit Hospital.

Linda Machado, Executrix of the Estate of Howard M. Machado, Deceased, and Linda Machado in her Own Right

v.

Michael Gawlas, D.O., Good Hope Family Physicians, P.C., Harrisburg Hospital, Garson M. Caruso, M.D., Jonathan B. Tocks, M.D., Richard L. Davis, M.D., and Cumberland Family Practice.

Appeal of Linda Machado.

Superior Court of Pennsylvania.

Argued April 16, 2002.

Filed July 15, 2002.

Alan S. Gold, Elkins Park, for Holy Spirit Hospital.

Martina W. McLaughlin, Philadelphia, for Machado.

Before JOYCE, BECK and POPOVICH, JJ.

JOYCE, J.

¶ 1 In this medical malpractice wrongful death and survival action,[2] Appellant, Holy Spirit Hospital, appeals from the judgment entered against it and in favor of Appellee, Linda Machado, in her own right, and as the executrix of the estate of her deceased husband, Howard M. Machado. Linda Machado also filed an appeal challenging the trial court's calculation of delay damages.[3] Both appeals have been consolidated. Upon careful review of the arguments advanced by the parties, we affirm in part and reverse in part; we remand for fur-

**2.** Through the course of this litigation some of the named defendants either settled with Appellee, Linda Machado, or were dismissed from the case. Thus when these appeals were filed, the only remaining parties were Appellee, and the following Appellants: Holy Spirit Hospital; Garson M. Caruso; and Harrisburg Hospital.

**3.** While these appeals were pending, Garson M. Caruso, and Harrisburg Hospital entered into a settlement agreement with Appellee, Linda Machado. At this point, the only remaining parties are Appellee and Appellant, Holy Spirit Hospital.

ther proceedings consistent with this opinion.

¶ 2 The trial court has aptly recounted the procedural and factual background of this matter.

Initially, this case consisted of two separate causes of action against a variety of defendants. The actions were eventually consolidated on September 12, 1997. Many of the defendants were dismissed before and during trial through various motions and stipulations.

Following an eight-day jury trial that took place from March 27 to April 5, 2000, the estate of· Mr. Machado received a molded verdict of $647,426.00, which consisted of lost wages and pain and suffering. Under the wrongful death claim, Mrs. Machado, along with the Machados' twelve year-old daughter, Ashley, received a $275,000 award for loss of financial contribution. In addition, for loss of services, society and comfort, the jury awarded Mrs. Machado $650,000 and Ashley $1,500,000. After the court molded the verdict to prevent double recovery, the aggregate jury award totaled $3,072,426.

The jury apportioned negligence, with Holy Spirit Hospital assigned 75% of the liability; Dr. Caruso was found to be 25% negligent. During the trial, Harrisburg Hospital stipulated that Dr. Caruso acted within the scope of his· employment with Harrisburg Hospital during the time of the incident. None of the parties offered to settle prior to trial. Thus, Dr. Caruso and Harrisburg Hospital, as his employer, are responsible for $768,106.50 of the verdict. Holy Spirit is charged with the remaining $2,304,319.50. All three parties filed post-trial motions, with Dr. Caruso and

Harrisburg Hospital's submitted in consolidation . . . .

Initially, a brief factual review is in order. Mrs. Machado's decedent, Howard M. Machado, was born on May 8, 1946, and was employed as an airline pilot by Hawaiian Airlines. The Machados maintained their residence in Hampden Township, Cumberland County. After suffering discomfort following a meal while in Los Angeles on December 9, 1995, Mr. Machado flew home and made an appointment with Michael Gawlas, D.O. on December 11, 1995, complaining of epigastric pain. Dr. Gawlas determined that Mr. Machado's pain was attributable to gastrointestinal reflux with mild gastritis and esophagitis. Mr. Machado left the office with a prescription for an antacid and direction to schedule an upper GI in one month.

On December 17, 1995, after her husband's continued discomfort, Mrs. Machado telephoned Dr. Gawlas' office. Mrs. Machado relayed to Dr. Tocks, the covering physician, that the medication Dr. Gawlas prescribed was ineffective and that her husband was still enduring epigastric pain. After prescribing a different medication to no avail, Dr. Tocks directed Mr. Machado to report to Harrisburg Hospital for evaluation.

Upon arriving at the emergency room of Harrisburg Hospital, Mr. Machado was triaged as urgent and evaluated by Dr. Caruso, Harrisburg Hospital's emergency room physician. Mr. Machado conveyed to Dr. Caruso that he was experiencing pain in his upper abdominal area. After an ultrasound conducted by Barbara Kunkel, M.D., Dr. Caruso concluded that Mr. Machado was suffering from cholecystitis (gallbladder disease) and prescribed a pain medication.

Dr. Caruso then directed Mr. Machado to schedule an appointment with Susquehanna Surgeons for treatment and discharged him.

When the Machados returned home, Mrs. Machado telephoned their neighbor, Joseph Esposito, M.D., a surgeon with Susquehanna Surgeons, to schedule a surgical appointment. Upon learning of Mr. Machado's symptoms, Dr. Esposito visited him at home and conducted a physical examination. Dr. Esposito's findings prompted him to immediately admit Mr. Machado to Holy Spirit Hospital for gallbladder surgery the next morning. In his admission directive, Dr. Esposito ordered an EKG that was performed shortly after 10:00 that evening. The resultant self-diagnosing report indicated that Mr. Machado was experiencing a heart attack. However, instead of immediately reporting this condition, Holy Spirit staff placed Mr. Machado's EKG report in a tray for an electro cardiographer to interpret the next morning. FN 1.

> FN 1. Prior to trial, Holy Spirit [Hospital] admitted negligence in its failure to promptly read the EKG report.

During the night, Mr. Machado experienced constant epigastric pain and low blood pressure readings. His low blood pressure was attributed to dehydration until around 3:30 a.m. on December 18, 1995, when a nurse could not obtain a blood pressure reading. Another EKG was performed, which confirmed that Mr. Machado was indeed having a heart attack. At around 5:00 a.m., Holy Spirit staff transferred Mr. Machado to the intensive care unit, where his condition deteriorated.

When he stabilized, Mr. Machado was transported to Harrisburg Hospital for a cardiac catheterization and eventual bypass surgery. Indeed by December 20, 1995, Mr. Machado's condition improved such that he became a candidate for coronary bypass surgery. Mr. Machado's condition turned for the worse late that night, however, when he suffered another heart attack. Despite fervent efforts to save his life, Mr. Machado passed away at 9:30 p.m. on December 21, 1995.

Trial Court Opinion, 3/1/2001, at 1–4.

¶ 3 Following the jury verdict, Appellant filed post-trial motions which were denied by the trial court. Appellee filed a petition for delay damages which was granted in part and denied in part. Appellant now appeals from the judgment entered by the trial court. Appellee also appeals from the aspect of the judgment dealing with delay damages. The questions presented for our review by Appellant, Holy Spirit Hospital, are as follows:

1. Did the trial court err in instructing the jury that it had the ability to award damages to Ashley Machado, the daughter of the decedent, Howard M. Machado, for loss of parental consortium pursuant to the Wrongful Death Act?

2. Did the trial court err in instructing the jury that there were three plaintiffs in the case seeking damages when the wife of the decedent, Howard M. Machado, had brought the action as Executrix of an Estate and in her own right?

3. Did the trial court commit reversible error requiring a new trial when he provided a verdict slip to the jury which permitted the jury to provide separate damages to the minor daughter of the decedent, Howard M. Machado, for loss of consortium?

4. Did the trial court commit reversible error requiring a new trial when he

refused to allow counsel for Holy Spirit Hospital to cross-examine an expert witness of the codefendant when that expert provided testimony concerning the crucial issue in the case, causation?

Brief for Appellant, at 4.

 ¶ 4 As Appellant's first two issues relate to the trial court's jury instructions, our review of these issues will be guided by the following principles. "The purpose of a jury charge is to clarify the legal principles at issue. Thus, a jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations." *Rittenhouse v. Hanks*, 777 A.2d 1113, 1118 (Pa.Super.2001) (citations omitted).

> It is well settled that "[a]n inadequate jury instruction may amount to reversible error if it has a tendency to mislead the jury or if it omits material, which is basic and fundamental." *McClintock v. Works*, 716 A.2d 1262, 1264 (Pa.Super.1998) (citation omitted). Although a trial court need not use the specific language requested by a party, its words must sufficiently and fully convey the rules of law applicable to the case. *See Gravlin v. Fredavid Builders & Developers*, 450 Pa.Super. 655, 677 A.2d 1235 (1996).

*Clementi v. Procacci*, 762 A.2d 1086, 1092 (Pa.Super.2000). Further, an error in a jury instruction is sufficient grounds for a new trial, if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. *Boutte v. Seitchik*, 719 A.2d 319, 324 (Pa.Super.1998).

 ¶ 5 Not all errors in a charge require a new trial, however. "A charge will be found adequate unless the issues are not made clear to the jury or the jury

was palpably misled by what the trial judge said or unless there is an omission which amounts to fundamental error." *Id.* at 324–25. As our Supreme Court noted: "when the propriety of the jury instruction of the trial court is at issue, those instructions must be viewed *in toto* to determine if any error has been committed. Unless the charge as a whole can be demonstrated to have caused prejudicial error, we will not reverse for isolated inaccuracies." *Riddle Memorial Hospital v. Dohan*, 504 Pa. 571, 475 A.2d 1314, 1316 (1984). *Accord, Hall v. Jackson*, 788 A.2d 390, 399 (Pa.Super.2001) ("We review challenges to jury instructions to determine if the trial court abused its discretion or committed an error of law. We will not grant a new trial because of an erroneous jury instruction unless the jury charge in its entirety was unclear, inadequate, or tended to mislead or confuse the jury").

 ¶ 6 In the present case, Appellant first argues that the trial court erred in instructing the jury to award damages to the decedent's daughter, Ashley Machado, for loss of parental consortium pursuant to the Wrongful Death Act. We disagree. From a purely technical and semantic viewpoint, Pennsylvania does not, and cannot recognize the right to "parental consortium" or loss thereof. This is because "consortium" by definition is "the legal right of one **spouse** to the company, affection, and assistance of and to **sexual relations** with the other." Webster's Collegiate Dictionary, 10th Edition (1998) (emphasis added). Thus, to the extent that the trial court used the term "consortium" to describe Ashley's loss occasioned by the death of the decedent, that designation is wrong.

 ¶ 7 The above notwithstanding, our courts have recognized that under the

Wrongful Death Act,[4] children can recover for losses occasioned by the death of their parent(s).

> Under Pennsylvania law, a child can recover in a wrongful death action for the loss of companionship, comfort, society and guidance of a parent. *Steiner by Steiner v. Bell Telephone Co.*, 358 Pa.Super. 505, 510, 517 A.2d 1348, 1356 (1986), aff'd. 518 Pa. 57, 540 A.2d 266 (1988). This element of damages has also been described as "loss of guidance, tutelage, and moral upbringing." *Buchecker v. Reading Co.*, 271 Pa.Super. 35, 57, 412 A.2d 147, 158 (1979).

*Walton v. Avco Corp.*, 383 Pa.Super. 518, 557 A.2d 372, 388 (1989), aff'd in part, rev'd in part on other grounds, 530 Pa. 568, 610 A.2d 454 (1992). *See also*, Summary Of Pennsylvania Jurisprudence 2d Torts § 25:41 (1999). The losses recoverable by the children of the decedent in a wrongful death action include the loss of such services as the deceased's guidance, tutelage, and moral upbringing. These damages are recoverable not under the general theory of loss of "parental consortium" but as part of the damages in a wrongful death

action. *Quinn v. Com. Dept. of Transp.*, 719 A.2d 1105 (Pa.Cmwlth.1998), *appeal denied*, 737 A.2d 1227 (Pa.1999). However, "the definition of compensable services for the purpose of the death statute is similar to the definition of consortium as that term is applied in other negligence cases." Summary Of Pennsylvania Jurisprudence 2d Torts § 25:42 (1999). Thus, in the instant case, the trial court, in using the term "loss of parental consortium," to describe Ashley's loss, was indeed referring to the loss of such services as the father's guidance, tutelage, and moral upbringing. Therefore we find no error in the trial court's instruction to the jury that Ashley may recover damages for the loss of her father's guidance, tutelage, and moral upbringing.

¶ 8 Along the same lines, our Court has unequivocally stated that:

> The purpose of the Wrongful Death Statute, 42 Pa.C.S. § 8301, is to compensate "the decedent's survivors for the pecuniary losses they have sustained as a result of the decedent's death.... This includes the value of the services the victim would have rendered to his family

4. This statute provides as follows:

(a) General rule.—An action may be brought, under procedures prescribed by general rules, to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during his lifetime and any prior actions for the same injuries are consolidated with the wrongful death claim so as to avoid a duplicate recovery.

(b) Beneficiaries.—Except as provided in subsection (d), the right of action created by this section shall exist only for the benefit of the spouse, children or parents of the deceased, whether or not citizens or residents of this Commonwealth or elsewhere. The damages recovered shall be distributed to the beneficiaries in the proportion they would take the personal estate of the decedent in the case of intestacy and without liability to creditors of the deceased person under the statutes of this Commonwealth.

(c) Special damages.—In an action brought under subsection (a), the plaintiff shall be entitled to recover, in addition to other damages, damages for reasonable hospital, nursing, medical, funeral expenses and expenses of administration necessitated by reason of injuries causing death.

(d) Action by personal representative.—If no person is eligible to recover damages under subsection (b), the personal representative of the deceased may bring an action to recover damages for reasonable hospital, nursing, medical, funeral expenses and expenses of administration necessitated by reason of injuries causing death.

42 Pa.C.S.A. § 8301.

if he had lived." *Slaseman v. Myers*, 309 Pa.Super. 537, 545, 455 A.2d 1213, 1218 (1983). A wrongful death action does not compensate the decedent; it compensates the survivors for damages which they have sustained as a result of the decedent's death. *See: Dennick v. Scheiwer*, 381 Pa. 200, 201, 113 A.2d 318, 319 (1955).

Under the wrongful death act the widow or family is entitled, in addition to costs, to compensation for the loss of the contributions decedent would have made for such items as shelter, food, clothing, medical care, education, entertainment, gifts and recreation.

*Linebaugh v. Lehr*, 351 Pa.Super. 135, 505 A.2d 303, 304—305 (1986). *Accord, Quinn v. Com Dept. of Transp., supra.*

¶ 9 In the present case, the trial court correctly instructed the jury that Ashley may recover for the loss of decedent's services such as guidance, tutelage, moral upbringing, food, shelter clothing, etc. Viewing the jury instructions as a whole, we find that the trial court's isolated use of the incorrect term "consortium" in describing Ashley's loss was a harmless error, which does not warrant a reversal. The trial court's explanation of Ashley's loss properly informed the jury of the services, the loss of which Ashley sought to recover.

 ¶ 10 In its second issue Appellant argues that the trial court incorrectly told the jury that there were three plaintiffs in this case for purposes of the award of the damages, thereby informing the jury that Ashley was a plaintiff. This alleged error is harmless at most, if at all. Under the Wrongful Death Act, the decedent's daughter, Ashley, was entitled to initiate and maintain a wrongful death action for the death of her father. *See* 42 Pa.C.S.A.

§ 8301(b) (the right of action created by this section shall exist only for the benefit of the spouse, children or parents of the deceased, whether or not citizens or residents of this Commonwealth or elsewhere). It is undisputed that Ashley did not initiate or maintain such an action. She was not a named plaintiff in the complaint; the complaint was never amended to include her as plaintiff; and even though Ashley was a minor when the suit was filed, the caption of the complaint did not indicate that the action was brought on behalf of Ashley. Thus, at first glance, one would conclude that Ashley was not a plaintiff in this case, and that there was no basis for the trial court to instruct the jury to consider her as a plaintiff, either for purposes of liability or damages, or both. However, a closer examination is required.

¶ 11 Under Rule 2202 of the Rules of Civil Procedure,

(a) Except as otherwise provided in clause (b) of this rule, an action for wrongful death shall be brought only by the personal representative of the decedent for the benefit of those persons entitled by law to recover damages for such wrongful death.

(b) If no action for wrongful death has been brought within six months after the death of the decedent, the action may be brought by the personal representative or by any person entitled by law to recover damages in such action as trustee ad litem on behalf of all persons entitled to share in the damages.

*Id.* In the case at bar, the complaint was filed more than six months after the decedent's death. Thus, subsection (b) of Rule 2202 is applicable here. Under this subsection, either the personal representative of the deceased **or** (not and) any of the statutory beneficiaries may bring the ac-

tion. Here, Linda Machado brought the wrongful death action as the executrix of the decedent's estate. It was therefore impermissible for the other beneficiaries to maintain separate actions (*See* Pa.R.C.P. 2202(c)) or formally join in the action. *See* 6 Goodrich–Amram 2d § 2202(b):2 ("an action for wrongful death brought more than six months after a decedent's death by one who is not a personal representative of the decedent must be brought in the capacity of trustee ad litem on behalf of all parties in interest. This requirement applies only to a person other than the personal representative; the latter sues as personal representative").

¶ 12 Rule 2204 ensures that the interests of other parties in interest who are not named plaintiffs are protected. The rule requires that:

> In addition to all other facts required to be pleaded, the initial pleading of the plaintiff in an action for wrongful death shall state the plaintiff's relationship to the decedent, the plaintiff's right to bring the action, the names and last known residence addresses of all persons entitled by law to recover damages, their relationship to the decedent and that the action was brought in their behalf.

*Id.* Here, our examination of the record shows that Appellee's complaint indicated that the action was being maintained on behalf of the statutory beneficiaries, including Ashley. Specifically, the complaint averred that:

> Decedent left surviving him his wife, Linda Machado and daughter Ashley Machado . . . .
>
> Plaintiff hereby seeks on behalf of herself and any other statutory beneficiary

entitled to recover all damages allowable by law for the wrongful death of her husband Howard Machado, including loss of support, loss of services, loss of consortium, companionship, society, affection, guidance, counseling and tutelage as well as the expenses which have been incurred for funeral expenses, medical expenses and the cost of administration.

Plaintiff's First Amended Complaint, at ¶ 54 to ¶ 55.

■ ¶ 13 From the above complaint, it is clear that Appellee fully complied with the Rules of Civil Procedure in filing her wrongful death complaint and Appellant was fully aware that the action was being maintained on behalf of all the beneficiaries, including Ashley. The critical question then becomes whether the trial court erred in instructing the jury that Ashley should be considered a plaintiff. The most appropriate course of action would have been to inform the jury that pursuant to the Wrongful Death Act, Ashley, even though she was not a named plaintiff, was a beneficiary or a real party in interest and was entitled to damages (subject, of course, to the finding of liability) for her loss occasioned by the death of the decedent. Nevertheless, we hold that the trial did not commit reversible error in instructing the jury to consider Ashley a plaintiff. It would serve little purpose to reverse and remand this matter to the trial court simply for the trial court to substitute the word beneficiary for the word plaintiff in the jury instructions. Even if one accepts Appellant's argument that "instructing the jury that there were essentially three plaintiffs in the case confused the jury and led them [sic] to believe that Ashley Ma-

chado would receive all the money the jury awarded to her," [5] this does not warrant a conclusion that the trial court committed reversible error. Appellant fails to explain how, and does not claim that had the trial court used the proper term "beneficiary," in describing Ashley, as opposed to "plaintiff," this would or could have resulted in a different verdict or a smaller award. Further, there is no authority that requires a trial court to inform the jury of the portion or percentage of the damages to be received by each individual beneficiary in a wrongful death action.[6] In sum, because the trial court's use of the term plaintiff in referring to Ashley was intended to convey to the jury that Ashley is a beneficiary in the wrongful death action,[7] we find Appellant's argument unavailing. Accordingly, we conclude that the trial court's instruction to the jury to consider Ashley as a plaintiff in the wrongful death action does not constitute reversible error warranting a new trial.

 ¶ 14 The third argument advanced by Appellant is that the trial court erred in submitting a verdict form to the jury which incorrectly permitted the jury to award specific damages to Ashley Machado, erroneously leaving the jury to believe that Ashley would receive the entire damages awarded to her even though Ashley's mother would receive a percentage of Ashley's award. We agree with Appellant that the trial court erred in submitting to the jury a verdict slip that permitted the apportionment of damages but not for the reasons argued by Appellant. As we pointed out in footnote 6, *infra*, in a wrongful death action, an award of damages should not be apportioned by the jury among the beneficiaries but should be a lump sum amount which would then be distributed pursuant to the intestacy statute. *See Ferne v. Chadderton*, 363 Pa. 191, 69 A.2d 104 (1949); Summary Of Pennsylvania Jurisprudence 2d Torts § 25:50. The error of the trial court was not in leading the jury to believe that Ashley would receive the entire sum awarded to her. Even if, as Appellant desires, the verdict slip informed the jury that Ashley would not receive the entire amount awarded to her and that her mother would receive a percentage of Ashley's award, the verdict slip would still be erroneous. The error was in permitting the jury to apportion the wrongful death damage award in the first place.

¶ 15 Despite the above error by the trial court, Appellant is not entitled to a new trial. The error is simply harmless. This is because Appellant is not prejudiced by the jury's apportionment of the damage award in so far as there is no claim that the total award was excessive or was not

---

5. Brief for Appellant, at 28.

6. Indeed a trial court is not permitted to inform the jury of the percentage or proportion of the damage award to be distributed to the beneficiaries. Neither is a jury permitted to apportion the damage award among the beneficiaries. *See Ferne v. Chadderton*, 363 Pa. 191, 69 A.2d 104 (1949) (an award in a wrongful death action should not be apportioned by the jury among the beneficiaries but should be a lump sum which is then distributed as prescribed by the intestacy statute). Interestingly, Appellant does not challenge the trial court's verdict slip on the basis that it incorrectly instructed the jury to apportion the damage award among the beneficiaries.

7. The trial court reiterated this point in its opinion: "Although she was not captioned as a plaintiff in this case, Ashley's referral by the court in its instructions and on the verdict slip as such was merely an effort to clarify her status as a beneficiary to the jury." Trial Court Opinion, 3/1/2001, at 40.

supported by the evidence. Also, the jury's purported apportionment of the damages is inconsequential because the real apportionment of the damages must be done pursuant to the intestacy statute. Despite the jury's purported apportionment, the statutory beneficiaries must still petition the court for a proper apportionment pursuant to the intestacy statute. The post verdict battle between and among beneficiaries regarding the proper apportionment of the award pursuant to the intestacy statute does not in any manner prejudice or implicate Appellant's legal rights and obligations. Therefore, with respect to Appellant's legal rights and obligations, the trial court's error in permitting the jury to apportion the wrongful death damage award between the beneficiaries is harmless and inconsequential.

■ ¶ 16 The final argument advanced by Appellant is that the trial court erred in refusing to permit Appellant to cross-examine co-defendant's expert witness on the crucial issue of causation. It is within the discretion of the trial court to impose reasonable restraints on the nature and length of cross-examination. *See* Pa. R.E. 611; *Yankowsky v. Katz, Inc.,* 443 Pa.Super. 494, 662 A.2d 665, 668 (1995) (we recognize that as a general rule), "the admission or rejection of rebuttal evidence" is within the sound discretion of the trial judge; *see also Kline v. Behrendt,* 396 Pa.Super. 302, 578 A.2d 526 (1990) (trial court did not abuse its discretion in excluding rebuttal testimony where that testimony was composed solely of information already presented or immaterial). Thus, we review a trial court's decision to permit, curtail or preclude cross-examination for abuse of that discretion. In the case at bar, co-defendants, Dr. Michael Gawlas and Good Hope Family Physicians pre-

sented the testimony of Dr. David Kann, a cardiology expert. On direct examination, Dr. Kann testified that based upon the results of the cardiac enzyme testing, the decedent's heart damage must have occurred before his admission to Harrisburg Hospital on December 17, 1995. Following this direct examination, the court took a brief recess. After the recess, the court and the litigants were informed that Appellee and Dr. Michael Gawlas and Good Hope Family Physicians have reached a settlement. Given this state of affairs, the trial court discouraged Appellee's counsel from cross-examining Dr. Kann since the proponents of his testimony were no longer parties to the litigation. Appellant's counsel also sought to cross-examine Dr. Kann but the trial court did not permit the cross-examination. Specifically, Appellant's counsel stated: "I would like to have an opportunity to clarify his testimony on the question of the enzymes and as they relate to what may have happened at Holy Spirit Hospital." N.T. 3/27/2000—4/5/2000, Vol. II.. at 736. In essence, Appellant wanted to establish through Dr. Kann that the decedent's heart attack did not occur at Holy Spirit Hospital. The trial court explained its decision to preclude Appellant's cross-examination of Dr. Kann: "By not permitting cross-examination by Holy Spirit [Hospital], we rejected the contention ... that there were causation issues to be explored with Dr. Kann that had not been discussed during direct examination. To allow further questioning would have been duplicative and unduly time consuming, as it was obvious that Dr. Kann would have offered identical testimony to that provided during direct examination." Trial Court Opinion, 3/1/2001, at 31.

¶ 17 Upon careful review, we agree with the trial court's decision to preclude Appellant's cross-examination of Dr. Kann. It is

noteworthy that Dr. Kann did not testify on direct examination as to what happened or may have happened to the decedent at Holy Spirit Hospital. Therefore, it cannot be assumed that on cross-examination he can be questioned or that he can testify as to what happened or may have happened to the decedent at Holy Spirit Hospital. Even if one assumes that Dr. Kann would have testified on cross-examination that the decedent's heart attack did not occur at Holy Spirit Hospital, the trial court was still within the bounds of its discretion in precluding the cross-examination on the basis that the testimony would be duplicative. Indeed the record shows that Appellant subsequently presented ample expert testimony (by direct testimony and cross-examination) that based on the enzyme studies, the decedent's myocardiac infarction occurred before his admission to Holy Spirit Hospital on December 17, 1995. *See* N.T. 3/27/2000—4/5/2000, Vol. II., at 802–804; 844—874. Thus, the trial court was correct in deciding that Dr. Kann's testimony regarding what may or may not have happened to the decedent at Holy Spirit Hospital would have been duplicate. Accordingly, we find no error or abuse of discretion in the trial court's decision, and Appellant is entitled to no relief.

 ¶ 18 We now turn to the appeal filed by Appellee,[8] Linda Machado, in her own right, and as the executrix of the estate of her deceased husband, Howard M. Machado, dealing with delay damages. Following the jury verdict in her favor, Appellee filed a petition for delay damages which was granted in part and denied in part. Relying on *Anchorstar v. Mack Trucks Inc.*, 533 Pa. 177, 620 A.2d 1120 (1993), the trial court denied Appellee's request for delay damages on the wrongful death award, and held that delay damages are not recoverable in a wrongful death action.

¶ 19 In this appeal, Appellee argues that the trial court erred in holding that delay damages are not recoverable in a wrongful death claim. We agree. The case relied upon by the trial court, *Anchorstar*, does not stand for the proposition that delay damages are not recoverable in a wrongful death claim. *Anchorstar* did not even involve a wrongful death action. In that case, Milton Anchorstar, Jr. who suffered bodily injuries in an accident, instituted an action against Mack Trucks, Inc., TRW, Inc., and Penn Truck Leasing, Inc., based on a theory of strict liability. Milton's wife, Phyllis Anchorstar, also filed a derivative loss of consortium claim (as a separate cause of action) as a result of the injuries suffered by her husband. Following a jury verdict in favor of the Anchorstars, the trial court awarded delay damages to Mr. Anchorstar but refused to award delay damages to Mrs. Anchorstar on her loss of consortium award. On appeal, our Supreme Court addressed the issue of whether Pa.R.C.P. 238 provides for delay damages to be awarded where the underlying claim is for loss of consortium. The Court held that, under the clear and express language of Rule 238, delay damages are not applicable to such a claim. In so holding, the Supreme Court emphasized that loss of consortium claims do not seek compensation for "bodily injury, death or property damage," as required for the award of delay damages under Rule 238.

 ¶ 20 The error in the trial court's analysis and interpretation of *Anchorstar* is that it equates a loss of consor-

---

8. For ease of identification, we will continue to refer to Linda Machado as Appellee.

tium claim with a wrongful death action. While a loss of consortium claim can be an element of damages in a wrongful death action, it is not the sum total of a wrongful death action. In fact, some wrongful death actions do not include loss of consortium claims: for instance, a child cannot claim loss of consortium in a wrongful death action for the death of the child's parent. As previously noted only a spouse can claim loss consortium for the death of the other spouse. In the case at bar, properly speaking, Ashley did not make a claim based on loss of consortium—her claim was based on loss of the decedent's services such as guidance, tutelage, moral upbringing, food, shelter, clothing, etc. Also, the loss of consortium claim involved in *Anchorstar* was alleged as a separate cause of action that was derived from the action instituted by Mr. Anchorstar. Unlike other personal injury cases, in wrongful death actions loss of consortium cannot be alleged as a separate cause of action. In a wrongful death action, the loss of consortium claim is only an element of damages. Therefore, the reliance on *Anchorstar* was misplaced.

■ ¶ 21 More importantly, the plain language of Pa.R.C.P. 238 indicates that death actions are among the category of actions for which delay damages may be recovered:

> (a)(1) At the request of the plaintiff in a civil action seeking monetary relief for bodily injury, **death** or property damage, damages for delay shall be added to the amount of compensatory damages awarded against each defendant or additional defendant found to be liable to the plaintiff in the verdict of a jury, in the

decision of the court in a nonjury trial or in the award of arbitrators appointed under section 7361 of the Judicial Code, 42 Pa.C.S. § 7361, and shall become part of the verdict, decision or award.

Pa.R.C.P. 238 (emphasis added). A wrongful death action is undeniably a civil action seeking monetary relief for the death of the decedent. Appellant argues, without providing any authority, that the word death in Rule 238 refers to survival actions. Our independent research revealed no such authority. Accordingly, we conclude that under Rule 238, delay damages are recoverable in a wrongful death action.[9]

¶ 22 Our conclusion is quite consistent with several Pennsylvania cases which have implicitly recognized that delay damages are recoverable in a wrongful death action. *See Rittenhouse v. Hanks,* 777 A.2d 1113, 1120 (Pa.Super.2001) (upholding the trial court's computation of delay damages in a wrongful death action); *Gunn v. Grossman,* 748 A.2d 1235, 1245—1246 (Pa.Super.2000) (affirming the trial court's decision to award delay damages in a wrongful death action, holding that "the trial court's award of delay damages was appropriate in this case"); *Hall v. Jackson,* 788 A.2d 390 (Pa.Super.2001) (affirming the judgment entered by the trial court in a wrongful death action; the judgment included the award of delay damages); *Williams v. Southeastern Pennsylvania Transp. Authority,* 741 A.2d 848 (Pa. Cmwlth.1999) (affirming the order of the trial court, which among other things, awarded delay damages in a wrongful death action); *Quinn v. Com. Dept. of Transp.,* 719 A.2d 1105 (Pa.Cmwlth.1998)

9. It is noteworthy that neither Appellant nor the trial court provides any authority that

unequivocally states that delay damages are not recoverable in a wrongful death action.

(same).[10]

¶ 23 In light of the foregoing, we reiterate that pursuant to Rule 238, delay damages are recoverable in a wrongful death action. The trial court committed an error in holding otherwise.

██ ¶ 24 The next issue raised by Appellee on delay damages relates to the trial court's determination that Appellee was not entitled to delay damages on the portion of the verdict attributable to Medical Professional Liability Catastrophic Loss Fund (CAT Fund). The trial court ruled that Appellee was not entitled to receive delay damages from Holy Spirit Hospital with respect to the amount of settlement paid by CAT Fund. We have carefully reviewed the trial court's decision on the above issue and we are satisfied that the trial court correctly determined that pursuant to Appellee's settlement agreement with CAT Fund, Appellee waived her right to delay damages with respect to the settlement amount.[11]

¶ 25 In conclusion, with respect to the appeal filed by Appellant, Holy Spirit Hospital, we find no error warranting reversal or the grant of a new trial. We therefore affirm the judgment of the trial court with respect to that appeal. Regarding the appeal filed by Appellee, Linda Machado, we find that the trial court erred in holding that delay damages are not recoverable in a wrongful death action. As a result of this error, we are constrained to reverse the decision of the trial court on this issue and we remand for a calculation of delay damages on the wrongful death award. In all other respects, we affirm the judgment entered by the trial court.

¶ 26 Affirmed in part, and reversed in part. Remanded for the calculation of delay damages on the wrongful death award. Jurisdiction relinquished.

10. Although not binding on this Court, we find the decision of the Commonwealth Court on this issue instructive.

11. The pertinent portion of the settlement agreement provides as follows: "It is further understood that settlement with the Fund has been achieved. Therefore, Plaintiff is foregoing any delay damages and/or post judgment interest relative to any layer of Fund coverage." CAT Fund Settlement Agreement ¶ 3.