J-A01040-21

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JOHN P. DISTEFANO, AS ADMINISTRATOR OF THE ESTATE OF LISA E. DISTEFANO, DECEASED, | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPELLEE | : : : | |
| v. | : : : | |
| SARAH E. ROBIN, D.O. AND CENTRAL BUCKS FAMILY PRACTICE, P.C., | : : : : : | |
| APPELLANTS | : | No. 872 EDA 2020 |

Appeal from the Order Dated February 11, 2020
in the Court of Common Pleas of Bucks County
Civil Division at No(s):  No. 2015-07319

BEFORE:    BENDER, P.J.E., OLSON, J. and STRASSBURGER, J.*

MEMORANDUM BY BENDER, P.J.E.:                **FILED JUNE 22, 2021**

Appellants, Sarah E. Robin, D.O., and Central Bucks Family Practice, P.C. ("the Practice"), appeal from the trial court's February 11, 2020 order that granted a motion for a new trial limited to the issue of damages filed by John P. DiStefano, as administrator of the estate of his deceased wife, Lisa E. DiStefano.  After review, we affirm.

The trial court provided a comprehensive summary of the background of this case as follows:

> As a result of the death of his wife due to cardiac failure on January 10, 2014, [Mr. DiStefano] filed a complaint against [Appellants] alleging medical negligence, including claims brought pursuant to the Pennsylvania Wrongful Death Act (Count I) and Survival Act (Count II).

---

* Retired Senior Judge assigned to the Superior Court.

A trial by jury which spanned nine (9) days began on July 31, 2019, during which evidence was presented that [Ms. DiStefano] was seen by her family physician, Dr. Robin, of [the Practice], on October 31, 2013, complaining of stomach pain every twenty (20) minutes, with pain radiating down her arms. Ms. DiStefano did not exhibit dyspnea, or shortness of breath, or pain in her sternum or chest area,[1] or heartburn, and her blood pressure was elevated at 140/108. Dr. Robin ordered an EKG, the results of which she interpreted as normal. Based upon the EKG test results and her physical examination of Ms. DiStefano, Dr. Robin concluded that Ms. DiStefano was suffering from gastroesophageal reflux disease, or GERD, and prescribed Prilosec, a drug used to treat heartburn. Dr. Robin additionally advised her to consume frequent small meals and stop smoking. Dr. Robin did not include coronary artery disease (CAD) in her differential diagnosis.

[1] Dr. Robin noted that Ms. DiStefano's abdominal exam was positive for mid-epigastric tenderness on palpation.

Ms. DiStefano returned to see Dr. Robin on November 7, 2013. Her abdominal pain was much better. Dr. Robin's physical examination of Ms. DiStefano did not reveal any heart or lung abnormalities, but Dr. Robin was able to reproduce the abdominal tenderness on palpation. While Dr. Robin acknowledged that gastrointestinal disease and myocardial ischemia, in which the heart muscle is not receiving enough oxygen, can mimic each other, she again concluded that Ms. DiStefano was suffering from GERD. No cardiac workup was performed on November 7, 2013. Ms. DiStefano was asked to return in February 2014 for a follow-up.[2]

[2] Subsequent to the November 7, 2013 office visit, Ms. DiStefano experienced additional episodes of pain, which, given the diagnosis of Dr. Robin, she believed were caused by heartburn.

On January 3, 2014, at 8:54 a.m., M[s]. DiStefano called Dr. Robin's office, spoke with staff, advised that her pain had worsened, and requested to see a specialist. She was referred by [Appellants] to gastroenterologist, Dr. Alan Chang. Dr. Robin did not speak directly with Ms. DiStefano on January 3.

The next day, Ms. DiStefano experienced cardiac arrest while at home in bed, and she was emergently transported to the Doylestown Hospital cardiac catherization lab, where it was determined that she had a "very high graded occlusion" of one of

the major arteries, the left anterior descending artery (LAD), in front of her heart. The cardiologist was successful in opening the artery, but Ms. DiStefano suffered severe brain damage from lack of oxygen. Unfortunately, she passed away almost a week later, on January 10, 2014.

A. Factual Record as to Liability

The jury was presented with often-conflicting testimony by the respective parties' medical expert witnesses. Conflicts concerned appropriate interpretation of the results of the EKG test that Dr. Robin had ordered, whether or not CAD should have been considered and evaluated by [Appellants], and whether or not Ms. DiStefano should have been referred by [Appellants] to a cardiologist after her first visit with Dr. Robin on October 31, 2013. Although Dr. Robin testified that she had interpreted the EKG test results as normal, she acknowledged in her explanation of the EKG test results that she had misidentified certain electrical wave impulses from the EKG test that monitor the heart.

Mr. DiStefano presented Dr. Michael McGonigal, a board-certified physician in family medicine and geriatrics, who testified that angina, or heart related pain, can be perceived as abdominal pain. He opined that Ms. DiStefano's October 31, 2013 EKG test results were abnormal, contrary to what he described as Dr. Robin's incorrect interpretation. He observed that there had been no report by Ms. DiStefano of any bad taste in her mouth which would be symptomatic of GERD, and he further testified that his review of the medical reports revealed a collateralization to the [LAD] of Ms. DiStefano's heart, indicating that a blockage had been there for quite some time. He opined that Dr. Robin's failure to obtain a further cardiac evaluation was a deviation from the standards of reasonable medical care, which increased the risk of harm, including death, to Ms. DiStefano.[3]

[3] Mr. DiStefano's experts testified that timely cardiac referral of Ms. DiStefano would have increased the likelihood of detecting the significant CAD from which she suffered, with resultant life-saving treatment.

Mr. DiStefano also presented Dr. Howard Cooper, board-certified cardiologist and the director of inpatient cardiology and the coronary intensive care unit at Westchester Medical Center in New York. Dr. Cooper testified that, based on his review of Ms. DiStefano's medical records and her complaints of sharp pains

emanating down her arms every twenty (20) minutes, along with the risk factors involved, Dr. Robin should have initially considered the pain to be caused by her heart, and that there should have been a more thorough review of her cardiac condition. Dr. Robin's failure to consider and act upon a potential cardiac etiology constitutes substandard medical care, per Dr. Cooper.[4] In reviewing the EKG test results, Dr. Cooper testified that despite Dr. Robin's conclusion that the results were normal, Ms. DiStefano's EKG test results were not normal, and those results indicated the possibility that Ms. DiStefano had experienced a previous heart attack.

[4] Dr. Cooper further testified that it is reasonable medical practice to consider and rule out the most serious medical explanation for a constellation of symptoms before concluding that such symptoms are the result of a less serious diagnosis. Dr. Cooper noted that Dr. Robin's failure to adhere to this reasonable practice with regard to [Ms. DiStefano] deviated from the standard of care. Dr. McMonigal testified to the same effect.

Dr. Cooper observed that Ms. DiStefano had not complained of typical symptoms of GERD, such as heartburn, a bad taste in the mouth, and dyspepsia or upset stomach. Dr. Cooper concurred that the symptoms of GERD can mimic those of heart disease, and although Ms. DiStefano returned to Dr. Robin a week later and reported her pain had resolved, he testified that "the constellation of symptoms" was typical of "unstable angina." He testified that despite prior descriptions of Ms. DiStefano's pain as "mid-epigastric as opposed to sternal pain," it was still "clearly related to the heart" and possible angina[.]

Dr. Cooper opined that Ms. DiStefano died on January 10, 2014[,] as a result of the heart attack she experienced at home one week earlier, which caused her heart to go into an unstable rhythm creating severe, irreversible brain damage due to inadequate blood circulation and lack of oxygen.

Dr. Cooper strenuously disagreed with the opinion of a family physician defense expert witness, Dr. John Peniston, that Ms. DiStefano's cardiac event that occurred in January 2014 had nothing to do with the symptoms she reported to Dr. Robin on October 31, 2013. Dr. Cooper testified that due to the presences of "collateral [arteries]," it was certain that there had been "a tight stenosis or blockage of the left anterior descending artery" for a

"significant period of time," and that Ms. DiStefano's symptoms on October 31, 2013[,] "were the same symptoms which later occurred or were followed by a myocardial infarction, cardiac arrest and death."

On cross-examination, Dr. Cooper acknowledged that if abdominal pain is cardiac in nature, it should not be reproducible on physical examination; that two board-certified cardiologists can disagree on the interpretation of the same EKG test results and can come to different conclusions as to the right course of treatment; and that an EKG is not mandated if the family physician has correctly diagnosed a patient with GERD.

Defense expert witness, Dr. Peniston, a board-certified family physician, opined, based upon his review of the medical records and deposition testimony of the various witnesses, that he believed Dr. Robin met the standard of medical care in her treatment of Ms. DiStefano. Dr. Peniston concurred with Dr. Robin's course of treatment for Ms. DiStefano, and he testified that in his opinion, the results of the EKG test did not show active ischemia or evidence of a prior heart attack. Dr. Peniston insisted that based upon the symptoms presented by Ms. DiStefano, "no red flags" went up and he "would not have done an EKG on a patient in [his] office with reproducible abdominal pain."

The defense also presented as an expert witness Dr. Mark Tecce, a board-certified clinical cardiologist, who testified that based upon his review of the medical records and deposition testimony related to this matter, he did not believe a cardiology referral was necessary for Ms. DiStefano after her second visit to Dr. Robin, and that Dr. Robin did not deviate from reasonable standards of medical care in her treatment of Ms. DiStefano. He concurred that cardiac pain or pain caused by coronary artery disease is not typically reproducible, and noted that Dr. Robin "was able to elicit some abdominal tenderness, some diffuse abdominal tenderness on exam[ination]" of Ms. DiStefano. Based upon his review of the results of Ms. DiStefano's EKG test, Dr. Tecce observed that Ms. DiStefano's "atrial mechanism and the sinus rhythm was normal." He opined that the EKG results were normal, noted that the computer interpretation or computerized reading of the results agreed with Dr. Robin's interpretation, and stated that he did not think the EKG showed a prior myocardial infarction. Dr. Tecce testified that it takes months to years for collaterals to form as a result of CAD. He conceded that Ms. DiStefano had [CAD] as of October 31, 2013. He also acknowledged that the CAD was

potentially detectable. Had cardiac testing been done, such as stress testing or angiography, Dr. Tecce acknowledged, there was an increased likelihood of detecting CAD. According to Dr. Tecce, the diagnosis and treatment of CAD would have reduced the risk of occurrence of myocardial infarction and sudden cardiac death experienced by Ms. DiStefano.

B. Factual Record as to Damages

[Ms.] DiStefano was 47 years old at the time of her death. She married [Mr.] DiStefano in 1989. They had two sons, John[, born June 1990,] and Joe[, born October 1992]. Ms. DiStefano was a college graduate who earned approximately $44,000 in 2013 as a bookkeeper. She had worked at Keenan Motors since 2011. She worked outside the home before then as a bookkeeper and as the owner of a restaurant and inn.

[Mr. DiStefano's] economic expert, Andrew Verzilli, opined that Ms. DiStefano's loss of earning capacity, net of personal maintenance expenses, was six hundred thirty-two thousand nine hundred eighty-two dollars ($632,982.00). Mr. Verzilli also testified that the value of the loss of household services was four hundred four thousand seven hundred sixty-eight dollars ($404,768.00).

[Appellants] did not present an economic witness at trial, although they submitted the economic report of William E. Harris in discovery and made the jury aware during Mr. Verzilli's cross-examination that the defense economist disagreed with some of Mr. Verzilli's conclusions. While [Appellants] challenged Mr. Verzilli's opinions regarding work-life expectancy, age to retirement, fringe benefits[,] and personal maintenance, [Appellants] never suggested a lower number anywhere as limited as the $4,000.00 assigned by the jury in its verdict. Although [Appellants] cross-examined Mr. Verzilli regarding household services and questioned whether the number of hours Mr. Verzilli assumed [Ms. DiStefano] would have provided household services was inflated, [Appellants] never suggested that there was no value to the household services that Ms. DiStefano could have been expected to perform during the remainder of her life expectancy.

There was abundant testimony that Ms. DiStefano experienced pain between the time of the alleged malpractice events of October 31, 2013 and her heart attack on January 4, 2014. The

episodes of pain that sent Ms. DiStefano to Dr. Robin's office on October 31, 2013[,] worsened after November 7, 2013. Mr. DiStefano estimated that the episodes of pain became worse in December[] 2013. These episodes of pain were also witnessed by her children[.] Earlier in the evening on the night of her heart attack, she sat-up in bed after experiencing a severe attack.

Dr. McGonigal indicated that the catheterization helped confirm the link between Ms. DiStefano's symptoms from October 31st and severe coronary disease. Dr. Cooper testified that what was described as stomach pain was actually angina pectoris. The pain described was related to her heart. The Doylestown Hospital records described epigastric pain returning and worsening in the days before her heart attack. In Dr. Cooper's opinion, Ms. DiStefano's heart disease was responsible for the pain leading up to her heart attack. It was Dr. Robin's failure to investigate this underlying condition (CAD) that was the basis of the alleged negligence.

Every witness who testified regarding the relationship between [Ms.] DiStefano and her husband was consistent in observing that Ms. DiStefano loved her husband and he loved her, that they were best friends, and that their relationship was extraordinary. Those same witnesses described Ms. DiStefano as a dedicated mother who loved her sons and placed their interests above her own. The family was close knit. The evidence demonstrated that Ms. DiStefano was a strong woman who was the rock of her family. Her family and friends spoke of her as a bright, happy, loving wife and mother, who was generous and self-sacrificing. Her sister-in-law testified that Ms. DiStefano sacrificed so her boys could go to college.

The record shows that son John attributed his being able to graduate from college, in part, to his mother's assistance. The jury also heard from family members who thought son Joe[]'s dropping out of college was, in part, due to his mother's death. Joe agreed; if his mother were alive, he believed he would have stayed in school[.]

The uncontroverted evidence demonstrated the significant guidance Ms. DiStefano gave to her sons. Her son, John, credited his mother with helping him battle depression by persuading him to seek medical assistance, and by being there to listen to him. Her comfort and guidance were significant in his life. In a similar vein, Joe testified that he was continually reaching out to his

- 7 -

mother for her advice. Her husband and sons considered her their best friend.

The jury heard that Ms. DiStefano taught her sons to garden and cook[.] She contributed to the household with her cooking, cleaning, gardening[,] and creating a warm home environment with family events and Christmas parties. Ms. DiStefano also was responsible for creating special events such as a surprise vacation cruise for her husband's 40th birthday.

More than one witness testified that Mr. and Ms. DiStefano were a team; they made decisions together. Joe told the jury how his mother was upset when John had to go out of town for four or five days on business.

Even though the boys were adults at the time of her death, there was no evidence [t]hat she had removed herself from their lives. On the contrary, she remained substantially involved with her family.

[Appellants] did not cross-examine any witnesses regarding the relationship between Ms. DiStefano and her sons or husband. To the extent there was testimony from friends or family concerning the contributions and services by Ms. DiStefano for [Mr.] DiStefano and his sons, such topics were totally uncontroverted, and unchallenged.

It was stipulated for the jury that the actual medical expenses incurred for Ms. DiStefano's medical care from January 4, 2014[,] until her death on January 10, 2014[,] was thirty-four thousand one hundred seventy-nine dollars and thirty-two cents ($34,179.32), and that her funeral bill was eleven thousand eight hundred ninety-three dollars and forty cents ($11,893.40).

C. The Verdict

On August 8, 2019, upon conclusion of testimony, the jury retired to deliberate, and thereafter forwarded two questions to th[e trial court]. First, the jury requested a copy of the written definition of negligence, and second, they asked what would happen if they could not get ten jurors to agree. In response to these inquires, with the consent of counsel, th[e trial court] read to the jury the standard Pennsylvania jury instructions 14.00, Negligence; 14.10, Professional Negligence; and 12.40, the standard jury instruction for a deadlocked jury. Neither party objected to any of these instructions. Thereafter, the jury returned with a verdict in favor

of [Mr. DiStefano], responding in the affirmative to the two special interrogatories pertaining to liability; that the medical care rendered to [Ms.] DiStefano in 2013 by [] Dr. Robin fell below the standard of applicable medical care, and that the negligence of Dr. Robin was a factual cause of harm to Ms. DiStefano.

In response to special interrogatories pertaining to damages, the jury awarded total wrongful death damages of forty-six thousand seventy-two dollars and seventy-two cents ($46,072.72), comprised of the stipulated medical expenses of $34,179.32 and funeral expenses of $11,893.40, and total survival damages of $4,000 for lost earnings, past and future. The total damages award, then, was fifty thousand seventy-two dollars and seventy-two cents ($50,072.72). The jury awarded zero lost contributions (past and future) to Ms. DiStefano's husband and sons, and zero to the family for past and future lost services, society, and comfort. Moreover, the jury awarded zero for non-economic survival damages, including mental and physical pain and suffering, embarrassment, humiliation[,] and loss of ability to enjoy the pleasures of life for Ms. DiStefano from October 31, 2013[,] to her death on January 10, 2014.

On August 14, 2019, th[e trial court] entered an order per stipulation of counsel, molding the verdict entered on August 8, 2019, to include [the Practice] as a defendant against whom the verdict was entered.

On August 15, 2019, [Mr. DiStefano] filed a motion for post-trial relief pursuant to Pa.R.C.P. 227.1(a)(1), seeking a new trial on damages only. [Mr. DiStefano] argued that the low damages awarded by the jury shocked one's sense of justice, did not bear a reasonable relation to the losses suffered, and that because liability had been fairly determined or was free from doubt and the damages are not "intertwined" with the issue of liability, a new trial should be ordered on the issue of damages only.

On August 19, 2019, [Mr. DiStefano] filed a motion for Pa.R.C.P. 238 Delay Damages. This motion was unopposed by [Appellants], and on February 11, 2020, th[e trial court] entered an order granting the motion and adding delay damages of six thousand eight dollars and eighty-one cents ($6,008.81) to the wrongful death damages[,] and five hundred ninety-one dollars and fifteen cents ($591.15) to the survival damages for a combined total molded verdict of fifty-seven thousand four hundred seventy-two dollars and sixty-eight cents ($57,472.68.)

> After submission of legal memoranda and oral argument on February 3, 2020, th[e] trial court entered a separate order on February 11, 2020, granting [Mr. DiStefano's] motion for a new trial limited to damages.

Trial Court Opinion (TCO), 6/4/2020, at 1-12 (citations to the record and unnecessary capitalization omitted).

On March 10, 2020, Appellants filed a timely notice of appeal.[1] The trial court subsequently directed Appellants to file concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and they timely did so.

Presently, Appellants raise the following issues for our review:

1. Whether the trial court grossly abused its discretion in concluding that the jury's damages award on four (4) categories of damages under the Wrongful Death and Survival Acts bore no reasonable relationship to the damages presented during trial?

2. Whether the trial court grossly abused its discretion in failing to recognize that the jury's verdict and damages award constituted a permissible compromise verdict?

3. Whether the trial court grossly abused its discretion by awarding [Mr. DiStefano] a new trial limited to the issue of damages, rather than allowing the jury's verdict to stand, when the jury's verdict was permitted by and consistent with the agreed-upon verdict sheet, to which [Mr. DiStefano] did not object to its wording?

Appellants' Brief at 4.

_____

[1] Appellants appeal pursuant to Pa.R.A.P. 311(a)(6), which allows an appeal to be taken as of right from an interlocutory order in a civil action awarding a new trial. *See* Appellants' Brief at 1; *see also Mirabel v. Morales*, 57 A.3d 144, 149 n.6 (Pa. Super. 2012) (acknowledging that this Court has jurisdiction to hear an appeal from an order granting a new trial limited solely to the issue of damages under Pa.R.A.P. 311(a)(6)) (citation omitted).

We apply the following standard of review to such claims:

The decision to grant a new trial on the grounds of inadequacy of damages is a matter within the trial court's discretion. We will not disturb the trial court's decision unless the court palpably abused its discretion or committed an error of law.

As a general rule, a verdict in an action for a personal tort may be set aside as inadequate when, and only when, it is so inadequate as to indicate passion, prejudice, partiality, or corruption, or that the jury disregarded the instruction of the court, or in some instances, where there was a vital misapprehension or mistake on the part of the jury, or where it clearly appears from the uncontradicted evidence that the amount of the verdict bears no reasonable relation to the loss suffered by the plaintiff, or, according to some cases, where otherwise, there has been an evident failure of justice to the plaintiff, or where the award is so inadequate that it should not be permitted to stand. Generally, a verdict will not be disturbed merely on account of the smallness of the damages awarded or because the reviewing court would have awarded more.

A trial court may only grant a new trial when the jury's verdict is so contrary that it shocks one's sense of justice. A reversal based on the inadequacy of a verdict is appropriate only where injustice of the verdict stands forth like a beacon. However, a new trial should not be granted due to a mere conflict in testimony or because the trial judge, on the same facts, would have arrived at a different conclusion.

*Fischer v. Troiano*, 768 A.2d 1126, 1129 (Pa. Super. 2001) (internal citations, quotation marks, and ellipsis omitted).

We also bear in mind the following:

Pennsylvania's Wrongful Death Act, 42 [Pa.C.S.] § 8301, allows a spouse, children or parents of a deceased to sue another for a wrongful or neglectful act that led to the death of the deceased. This Court has previously explained the damages available under the Wrongful Death Act:

Damages for wrongful death are the value of the decedent's life to the family, as well as expenses caused to the family by reason of the death. Thus, members of the decedent's

family enumerated in the Wrongful Death Act, *see* 42 Pa.C.S. § 8301(b), may recover not only for medical, funeral, and estate administration expenses they incur, but also for the value of his services, including society and comfort. *See id. See also Machado v. Kunkel*, 804 A.2d 1238, 1245 (Pa. Super. 2002) ("[T]he definition of compensable services for the purpose of the [wrongful] death statute is similar to the definition of consortium as that term is applied in other negligence cases.").

*Rettger v. UPMC Shadyside*, 991 A.2d 915, 932–933 (Pa. Super. 2010). Our Court has unequivocally stated that:

The purpose of the Wrongful Death Statute, 42 Pa.C.S. § 8301, is to compensate "the decedent's survivors for the pecuniary losses they have sustained as a result of the decedent's death…. This includes the value of the services the victim would have rendered to his family if he had lived." … A wrongful death action does not compensate the decedent; it compensates the survivors for damages which they have sustained as a result of the decedent's death.

Under the wrongful death act the widow or family is entitled, in addition to costs, to compensation for the loss of the contributions decedent would have made for such items as shelter, food, clothing, medical care, education, entertainment, gifts and recreation.

*Machado v. Kunkel*, 804 A.2d 1238, 1245–1246 (Pa. Super. 2002) (citations omitted).

*Hatwood v. Hosp. of the Univ. of Pennsylvania*, 55 A.3d 1229, 1235–36 (Pa. Super. 2012) (some quotation marks and citations omitted). A survival action permits the decedent's personal representative to pursue a cause of action that accrued to the decedent before death. 42 Pa.C.S. § 8302.

As detailed above, for the Wrongful Death Act damages, the jury awarded $46,072.72, which represented the sum of medical and funeral expenses stipulated by the parties. The jury awarded zero damages in two categories of wrongful death damages: (1) lost contributions (past and future)

to Mr. DiStefano and his two sons; and (2) non-economic damages (past and future) to Mr. DiStefano and his two sons. For the Survival Act damages, the jury awarded $4,000 in the category of lost earnings (past and future). The jury awarded zero damages in the category of "non-economic damages (mental and physical pain and suffering, embarrassment and humiliation, loss of ability to enjoy the pleasures of life for [Ms.] DiStefano from October 31, 2013[,] until the time of her death on January 10, 2014)." Jury Verdict Sheet, 8/8/2019, at 2.

Appellants advance several arguments contesting the trial court's discretion in granting a new trial limited to damages, and thus we address them together. *See* Appellants' Brief at 22−50. They argue that the jury's verdict bore a reasonable relationship to the damages evidence presented during trial, the jury's verdict and damages award constituted a permissible compromise verdict, and the jury's verdict was permitted by and consistent with the verdict sheet, to which Mr. DiStefano did not object. *Id.*

First, Appellants claim that the trial court failed to consider "reasonable explanations for the jury's damages award," namely that had she lived, Ms. DiStefano may have become medically disabled and unable to work due to an alleged pre-existing cardiac condition; Ms. DiStefano's sons were adults capable of living independently; the jury could have deduced from trial evidence that Ms. DiStefano's pain occurred before she first saw Dr. Robin or that her pain was not cardiac-related; the lack of evidence that Dr. Robin caused Ms. DiStefano any embarrassment or humiliation; and evidence that

Ms. DiStefano continued to participate in her usual daily activities up until the time of her heart attack. *Id.* at 22−23, 34−40; Appellants' Reply Brief at 2−3.

Next, Appellants argue that trial court failed to recognize the jury's verdict and damages award as a compromise verdict. They point to evidence presented at trial which "cast doubt" on Appellants' liability and suggested Ms. DiStefano may have been contributorily negligent in failing to advise Dr. Robin of all of her symptoms, and to the fact that the jury asked the trial court during its deliberations for the definition of negligence and what would happen if they could not all agree. Appellants' Brief at 23−24, 41−47; Appellants' Reply Brief at 5−12.

Finally, Appellants assert that "the verdict sheet included the words 'if any' above the categories of damages the jury was permitted to award, which constituted an express invitation for the jury to refrain from awarding damages in any category listed if the jury believed such damages were not warranted by the evidence." Appellants' Brief at 24−25. By not objecting to the verdict sheet, Appellants argue Mr. DiStefano waived any objection to the damages award. *Id.* at 25, 47−50.

The trial court explained its reasoning for granting a new trial as to damages, as follows:

> In applying pertinent decisional law to the facts of record in this case, it is apparent that the liability issues were thoroughly presented and probed by veteran, well-experienced, professional litigators on behalf of both sides. Although Appellants have asserted that the jury's inquires during deliberation concerning

the definition of negligence and concern about inability to reach a consensus reflected apparent uncertainty which resulted in a "compromise verdict," decisional law approving of a compromise verdict focuses primarily on cases where the jury must apportion negligence. This was not true in the present case. Indeed, the jury unanimously and unambiguously found that [] Dr. Robin was negligent and that [her] negligence was a factual cause of harm to Ms. DiStefano. This case did not require the jurors to determine whether multiple defendants were comparatively negligent, or whether [Ms. DiStefano] was contributorily negligent. The evidentiary record as well as the verdict sheet reflect that the issue of liability was fairly determined, and the jury determination was free from doubt. As a consequence, th[e trial c]ourt could not conclude that the jury's award of damages was intertwined with issues of liability. [The trial court] find[s] no merit, then, to the issues raised by Appellants….

In addition to determining whether liability was fairly determined and was not intertwined with damages issues, th[e trial c]ourt is required, in [its] evaluation and adjudication of [Mr. DiStefano's] Motion for a New Trial, to concurrently determine whether the damages awarded by the jury bore a reasonable relation to the uncontroverted evidence of the losses suffered by the parties, and if not, whether the verdict was so contrary to the uncontroverted evidence as to shock the [trial c]ourt's sense of justice.

In performing this analysis, we are mindful of the decision of **Rozanc v. Urbany**, 664 A.2d 619 (Pa. Super. 1995). There, despite the trial court's instruction to the jury that damages should be awarded to compensate the plaintiff for "all the physical and financial injury she has sustained as a result of the accident," and that "[d]amages should not be awarded on the basis of sympathy, benevolence or sentimentality, but should be limited to reasonable compensation for the injuries involved," the Superior Court reversed the trial court's denial of a motion for new trial because the testimony revealed the appellant had sustained injuries that naturally cause pain and suffering; the jury's disregard of such evidence was held to be grounds for a new trial. **Id.** at 622.

As noted above, the uncontroverted evidence in the present matter revealed that Ms. DiStefano, as of the time of her dealth, was a 47 year-old[,] college-educated woman who had been employed for at least two-and-one-half (2½) years at a local car dealership as a bookkeper, earning $44,689 per year. [Mr.

- 15 -

DiStefano's] economic expert therefore opined that Ms. DiStefano's total loss of earning capacity, net of personal maintenance, was $632,982.00, and he opined that her demise resulted in loss of household services valued at $404,000. Although Appellant[s'] counsel suggested on cross-examination that ultimately it was for the jury to decide how much longer Ms. DiStefano would work, and he challenged the 30% deduction for personal maintenance and loss of household services calculations, as well as the Social Security contributions in the loss of earnings calculations, Appellants did not present any evidence that substantially contradicted or refuted the figures submitted by [Mr. DiStefano's] economic expert. Those figures were essentially unchallenged. The issues presented in this case as to damages were readily separable from the liablity issues.

The jury, however, after determining that Dr. Robin was negligent and finding causation as well, only awarded [Mr. DiStefano] total wrongful death damages of $46,072.72 for the stipulated medical expenses and funeral expenses, and only $4,000.00 for lost earnings, past and future. Inexplicably, the jury awarded zero for noneconomic damages to [Mr. DiStefano] and [his] sons, and zero survivor action damages for Ms. DiStefano's own pain and suffering, embarassment, humiliation and loss of life's pleasures. As [the trial court] ha[s] noted, the evidentiary record suggested that [Ms. DiStefano's] total net loss of earning capacity was as much as $632,982.00 and the loss of her household services was as much as $404,000. Appellants presented no contradictory evidence to fairly suggest that [Mr. DiStefano's] economic expert's evaluations and calculations were unrealistic, or that Ms. DiStefano was unable to work, or had decided or would decide not to continue working in the future. [The trial court] can discern no rational reason for the jury's grossly inadequate award of $4,000.00 for her loss of earnings, past and future, in the face of the overwhelming evidence supporting a much more substantial award.

[The trial court] recognize[s] that if a jury verdict bears a "reasonable resemblance" to the evidence presented at trial, it is not the function of the [trial c]ourt to substitute its judgment for the jury's considered verdict. Moreover, it is the firm view of th[e trial c]ourt, based upon experience, that the jury system is worthy of great respect and deference; juries generally are committed to achieving just results for litigants. In the last ten plus (10+) years, th[e trial c]ourt has presided over dozens of medical malpractice trials among an even greater number of other civil

and criminal trials.  So it is stated with appropriate humility that [the trial court] ha[s] accrued perspective as a trial court (and while serving more than thirty (30) years as a trial attorney, arbitrator, and mediator), to fairly ascertain when a jury's verdict is shocking to the conscience, per the vast body of decisional appellate law addressing this and related issues.

Simply stated, based upon all of the pertinent law and facts recited in this opinion, the jury's inadequate damages verdict i[n] this case represents a miscarriage of justice which, in the words of [the] appellate courts, "stands forth like a beacon."  While liability was fairly litigated and determined, the damages verdict bears no reasonable relationship to the uncontroverted damages evidence presented by [Mr. Distefano].  The jury awarded zero (0) dollars in three (3) separate and distinct categories of wrongful death and survival damages, despite abundant and uncontroverted evidence of significant damages incurred by [Ms. DiStefano] as well as by her husband and two (2) sons.  Additionally, the jury's award of a total of four thousand dollars ($4,000.00) for lost earnings and lost earning capacity bears no reaonable relation to the evidence in that regard[,] even as argued by defense counsel, let alone a reasonable relation to the abundant evidence presented by [Mr. DiStefano].

TCO at 25-28 (footnote, citations to the record, heading, and unnecessary capitalization omitted).

We discern no abuse of discretion or error of law by the trial court.  The court carefully and reasonably explained why the verdict shocked its conscience and how it bore no reasonable relation to the losses suffered by Mr. DiStefano.  Further, we disagree with Appellants that Mr. DiStefano's economic expert did not provide uncontroverted testimony, *see* Appellants' Brief at 34−40, as the trial court correctly acknowledged that, though Appellants challenged the extent of Mr. DiStefano's damages at times, Appellants did not claim that Mr. DiStefano suffered − or would suffer in the future − **no** damages in the aforementioned categories.  As the trial court

- 17 -

recognized, Appellants' cross-examination of the expert may have challenged how many years Ms. DiStefano would have worked and the percentage the expert used in deducting personal maintenance expenses, but their cross-examination did not suggest there would be **no** damages at all. ***See*** TCO at 25−26 (citing N.T., 8/1/2019, at 32−47).

Further, we do not view the cross-examination as destroying the factual underpinnings of the expert's testimony and report or controverting his assessment of damages, as it was clear that there were damages in those categories. ***See Kiser v. Schulte***, 648 A.2d 1, 6 (Pa. 1994) ("Nor is this a case where the jury could completely discredit the testimony of [the expert,] as even under the scrutiny of extensive cross-examination his calculations yielded a net economic loss figure of $232,400. Instead, in this case, the jury totally disregarded the only evidence presented on the question of damages and settled on a somewhat capricious and inadequate amount of $25,000. The jury verdict here simply does not bear any rational relationship to the uncontroverted testimony presented by [the expert].") (footnote omitted). Accordingly, we discern no abuse of discretion on the part of the trial court in concluding that the jury's award of damages, namely zero damages in three categories of wrongful death and survival damages (lost contributions and non-economic damages) and $4,000.00 for past and future lost earnings, bore no rational relationship to the uncontroverted evidence presented by Mr. DiStefano.

Next, Appellants contend that the jury's verdict was a compromise verdict and should not be disturbed. This Court has explained that a "compromise verdict is one where the jury, in doubt as to the defendant's negligence or [the] plaintiff's contributory negligence, returns a verdict for the plaintiff but in a lesser amount than it would if these questions had been free from doubt." **Fischer**, 768 A.2d at 1131 (citation omitted).

We agree with the trial court that the jury's verdict here does not meet the definition of a compromise verdict. Recently, this Court addressed such argument in **Mazzie v. Lehigh Valley Hosp.-Muhlenberg**, ___ A.3d. ___, 2021 WL 1439637 (Pa. Super. filed Apr. 16, 2021). **Mazzie** involved a medical malpractice case where a jury found a physician acted negligently and awarded stipulated medical expenses, but did not award any non-economic damages for pain and suffering. **Mazzie**, 2021 WL 1439637 at *1. The trial court granted a new trial limited to the issue of damages, and the physician, physician's group, and hospital appealed. In rejecting their argument that the jury reached a compromise verdict, this Court explained as follows:

> We agree with the trial court that the jury's verdict here does not meet the definition of a compromise verdict [set forth in **Fischer**, **supra**]. The jury did not find that Mrs. Mazzie was contributorily negligent. Nor did the jury return a verdict in a lesser amount than the stipulated medical expenses. Rather, the jury … assigned full liability to Dr. Garcia. As such, we find that the jury did not reach a compromise verdict. **See Fischer**, 768 A.2d at 1131.

**Id.** at *8 (citations to record omitted).

As in **Mazzie**, we agree with the trial court that the jury's verdict here does not meet the definition of a compromise verdict. **See** TCO at 25.

- 19 -

Although liability was contested, the jury clearly found Dr. Robin to be negligent. Both parties were given a fair opportunity to litigate the issue of liability at trial and, thus, it was conclusively determined and need not be re-litigated. *See Fischer*, 768 A.2d at 1132. The jury here did not find that Ms. DiStefano was contributorily negligent. Nor did the jury return a verdict in a lesser amount than the stipulated medical and funeral expenses. Rather, the jury assigned full liability to Dr. Robin. *See* Jury Verdict Sheet, 8/8/2019, at 1. As such, we conclude that the jury did not reach a compromise verdict. *See Mazzie*, 2021 WL 1439637 at *8.

The trial court instead detailed the ways in which the verdict did not relate to the evidence produced at trial and shocked its conscience. Like in *Fischer*, the trial court in the case *sub judice* determined that the jury ignored the uncontroverted evidence of damages and concluded that Mr. DiStefano was entitled to a new trial as to damages. Under our deferential standard of review, Appellants have not convinced us that the trial court grossly abused its discretion in granting a new trial in this regard. As such, we will not interfere with the trial court's determination on the basis that the jury's verdict represented a permissible compromise verdict.[2]

---

[2] With respect to Appellants' jury-verdict-sheet claim, Appellants first raised it in their concise statement. *See* Rule 1925(b) Statement, 4/23/2020, at ¶7; *see generally* Response of Defendants in Opposition to Plaintiff's Motion for Post-Trial Relief, 12/4/2019; Memorandum of Law of Defendants in Opposition to Plaintiff's Motion for Post-Trial Relief, 12/4/2019. We find this issue waived for failure to raise it in the trial court. Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

- 20 -

For all of the foregoing reasons, we affirm the order of the trial court granting a new trial limited to the issue of damages.

Order affirmed.

Judge Strassburger did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/22/2021